842 A.2d 820

IN RE THE CONTEST OF THE DEMOCRATIC PRIMARY ELEC-
TION OF JUNE 3, 2003 FOR THE OFFICE OF ASSEMBLY OF
THE THIRTY–FIRST LEGISLATIVE DISTRICT AND IN RE
THE JUNE 3, 2003 DEMOCRATIC PRIMARY ELECTION FOR
THE OFFICE OF SENATE AND ASSEMBLY OF THE THIRTY–
FIRST LEGISLATIVE DISTRICT.

Superior Court of New Jersey
Appellate Division

Argued December 17, 2003—Decided January 27, 2004.

Before Judges KING, LISA and REISNER.

*John M. Carbone* argued the cause for appellant Joseph V. Doria, Jr. (*Carbone & Faasse and Schwartz, Simon, Edelstein,* attorneys; *Mr. Carbone,* on the brief).

*Angelo J. Genova and Elnardo J. Webster, II,* argued the cause for respondents Glenn Cunningham, Louis Manzo and Anthony Chiappone (*Genova, Burns & Vernoia and Booker, Rabinowitz, Trent, Lubetkin, Tully, DiPasquale & Webster,* attorneys; *Mr. Genova and Mr. Webster,* of counsel; *Sandro Polledri, Debra Shannon and Henry Karwowski,* on the brief).

*Donna Kelly,* Assistant Attorney General, argued the cause for respondent *Board of Elections (Peter C. Harvey,* Attorney General of New Jersey, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel; *Alan C. Stephens,* Deputy Attorney General, on the brief).

*Dennis J. Oury* argued the cause for respondent L. Harvey Smith.

*Cassandra T. Savoy* argued the cause for respondent Elba Perez–Cinciarelli.

*James P. Wyse* argued the cause for intervenor *New Jersey Election Law Enforcement Commission (Herold and Haines,* attorneys; *Mr. Wyse and Craig S. Provorny,* on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

This case involves campaign financing in the June 2003 primary election in the Thirty–First Legislative District. The Thirty–First District consists of the City of Bayonne and parts of the City of Jersey City. The Thirty–First District is historically heavily Democrat; victory in the Democrat primary is tantamount to victory in the general election.

The June 2003 primary election determined the District's two Democrat nominees for State Assembly and the Democrat nominee for State Senate. Joseph Doria (Assembly), Elba Perez–Cinciarelli (Assembly) and L. Harvey Smith (Senate) (the appellants) lost the primary election to Louis Manzo (Assembly), Anthony Chiapppone (Assembly), and Glenn Cunningham (Senate) (the respondents).

During and after the election, the appellants claimed the respondents blatantly violated the Campaign Contributions and Expenditures Reporting Act, *N.J.S.A.* 19:44A–1 to –47(Act). The appellants maintained that the violations arose from contributions that two "continuing political committees" made to the respondents. These continuing political committees were the Jersey City First Committee (JCF) and Reform Democratic Committee of Jersey City (RDC).

On July 25, the appellants filed a complaint in Hudson County Superior Court contesting the election under *N.J.S.A.* 19:29–1,[1]

---

[1] *N.J.S.A.* 19:29–1, which is part of the election law generally and not part of the Act, states:

> The nomination or election of any person to any public office or party position, or the approval or disapproval of any public proposition, may be

even though the Act authorizes the Election Law Enforcement Commission (ELEC) to hear complaints of Act violations.[2] ELEC is a four-member, bi-partisan commission appointed by the Governor with staggered terms. *N.J.S.A.* 19:44A–6. It is allocated within the Department of Law and Public Safety but is "independent of any supervision or control by the department." *Ibid.* The Commission appoints a full-time executive director and other personnel. *Ibid.* ELEC intervened on this appeal; it was not a party at the trial level.

The complaint also alleged claims of other election irregularities, not covered by the Act, which were properly cognizable in the Superior Court under the election contest provisions of Title 19. These claims were never substantiated and this aspect of the complaint was dismissed.

The Law Division judge adjudicated the case under the authority of the election contest statute, *N.J.S.A.* 19:29–1 to –14. In August 2003 the judge held testimonial hearings in accordance with *N.J.S.A.* 19:29–5 to –8, and, after the appellants presented evidence attempting to establish excessive spending in violation of the Act, he granted a motion to dismiss the contest for failure of proof.

---

contested by the voters of this State or any of its political subdivisions affected thereby upon 1 or more of the following grounds:

\* \* \* \*

(h) The paying, promise to pay or expenditure of any money or other thing of value or incurring of any liability in excess of the amount permitted by this title for any purpose or in any manner not authorized by this title(.)

[2] The Act states, at *N.J.S.A.* 19:44A–22d:

The [ELEC] may designate a hearing officer to hear complaints of violations of this act. Such hearing officer shall take testimony, compile a record and make factual findings, and shall submit the same to the commission, which shall have power to assess penalties within the limits and under conditions prescribed in [*N.J.S.A.* 19:44A–22b and c]. The commission shall review the record and findings of the hearing officer, but it may also seek additional testimony as it deems necessary. The commission's determination shall be by majority vote or the entire authorized membership thereof.

The judge ruled that certain provisions of the Act governing the contributions of such continuing political committees did not apply to primary elections, and even if they did, there was no causal nexus proved between the claimed illegal spending and the outcome of the primary. He also ordered the appellants to pay attorneys fees under *N.J.S.A.* 19:29–14.[3]

The appellants applied to this court for emergency relief, which we denied. The Supreme Court denied certification on October 15, 2003. In October 2003 we denied the appellants' motion for summary disposition, *R.* 2:8–3(b), but ordered a hearing on an accelerated basis.

We conclude that the Act applies to primary elections. In this regard we disagree with the Law Division judge and modify his decision. We agree with his ruling dismissing the election contest action because appellants failed to prove a significant relationship between the alleged violations and the outcome of the primary election. We deem this aspect of the dispute fairly and finally decided and *res judicata.* Appellants had the chance to present their proofs and did not shoulder their substantial burden.

Nevertheless, the judge made no findings with respect to any specific violations of the Act. We transfer the matter of these alleged violations and their penalties, if any, to ELEC for adjudication, *R.* 1:13–4, under its enforcement powers. *See N.J.S.A.* 19:44A–22. We affirm the award of costs for $2280 to respondents

---

[3] *N.J.S.A.* 19:29–14 states:

> The contestant and incumbent shall be liable to the officers and witnesses for the costs made by them, respectively. If the election be confirmed, or the petition dismissed, or the prosecution fail, judgment shall be rendered against the contestant for costs; and if the judgment be against the incumbent, or the election be set aside, he shall pay the costs at the discretion of the court; and in the case a contestant is successful in contesting the approval or disapproval of a proposition, the State, county or municipality, as the case may be, which caused the proposition to be submitted to the voters, shall pay the costs at the discretion of the court. After the entry of the judgment of the court the costs may be collected by attachment or otherwise.

under *N.J.S.A.* 19:29–14 because this award related to the claim of other election irregularities, not covered by the Act. This aspect of the complaint was dismissed at the trial level. This dismissal is not challenged on this appeal.

## I

The parties are bitter Democrat adversaries in the highly-charged atmosphere of Hudson County party politics. In September 2001 Robert Janiszewski, a Democrat and the Hudson County Executive, resigned his position under a cloud of allegations of government corruption. Janiszewski's resignation led to a rift in the Hudson County Democrat Committee (HCDC) over who should become the interim County Executive. The HCDC named Bernard Hartnett to the position until the next general election, scheduled for November 2002.

As the June 2002 primary election approached, the Democrat Party could not unite behind a single candidate. One faction supported Thomas DeGise, while the other faction supported Hartnett. DeGise won the primary election and later the 2002 general election for County Executive.

After Hartnett's defeat in the June 2002 primary, Joseph Cardwell and Robert Jackson, whom the judge described as the appellants' principal witnesses in this case, desired to restore control of the Hudson County Democrat Party to the Hartnett faction. To that end, on August 26, 2002 Cardwell registered a new "continuing political committee" named Jersey City First (JCF).[1]

---

[1] *N.J.S A.* 19:44A–3n defines a "continuing political committee" as:

> any group of two or more persons acting jointly, or any corporation, partnership, or any other incorporated or unincorporated association, including a political club, political action committee, civic association or other organization, which in any calendar year contributes or expects to contribute at least $2,500.00 to the aid or promotion of the candidacy of an individual, or of the candidacies of individuals, for elective public office, or the passage or defeat of a public question or public questions, and which

Meanwhile, in October 2002 Jackson created the Reform Democratic Committee of Jersey City (RDC), also a continuing political committee, although he did not file any registration papers with ELEC until April 2003. Like JCF, Jackson's testimony described RDC as composed of candidates for committee seats who were not aligned with the DeGise camp.

Both camps proceeded to prepare for the June 2003 primary election which would determine the party nominations for the Thirty–First District's State Senator and the two State Assembly seats. Aligned on the Hartnett side, and thus with JCF and RDC, were respondents Cunningham, Manzo, and Chiappone. On the other side were appellants Smith, Doria, and Perez–Cinciarelli.

Cunningham announced his candidacy on March 5, 2003. He began accepting contributions and making expenditures immediately. The judge found that Cunningham did not, as per *N.J.S.A.* 19:44A–9a, establish his candidate committee at that time but rather on May 2, 2003. Cunningham's committee was called "Cunningham for Senate." On the same day he established Cunningham for Senate, Cunningham also established "The Cunningham Democratic Team," a "joint candidates committee" under *N.J.S.A.* 19:44A–3r.[5]

---

may be expected to make contributions toward such aid or promotion or passage or defeat during a subsequent election, provided that the group, corporation, partnership, association or other organization has been determined to be a continuing political committee under subsection b. of section 8 of P.L.1973, c. 83 (C. 19:44A–8); provided that for purposes of this act, the term "continuing political committee" shall not include a "political party committee," as defined by subsection p. of this section, or a "legislative leadership committee," as defined by subsection s. of this section.

[5] *N.J.S.A.* 19:44A–3r defines such a committee as:

a committee established pursuant to subsection a. of section 9 of P.L.1973, c. 83 (C. 19:44A–9) by at least two candidates for the same elective public offices in the same election in a legislative district, county, municipality or school district, but not more candidates than the total number of the same elective public offices to be filled in that election, for the purpose of receiving contributions and making expenditures. For the purpose of this subsection: the offices of member of the Senate and members of the General

Thus, during the June 2003 primary election campaign, there existed: (a) two continuing political committees—JCF and RDC—aligned with the Hartnett group; (b) Cunningham's own political committee, Cunningham for Senate, aligned with the Hartnett group; and (c) a joint candidates committee, The Cunningham Democratic Team, aligned with the Hartnett group.

On May 27, 2003 appellants sued to enjoin The Cunningham Democratic Team and related organizations from further spending in violation of the Act. As we discuss below, the Act allows a candidate to institute a summary action in the Superior Court to enjoin spending and contribution violations of an opponent prior to an election. *See N.J.S.A.* 19:44A–22.1. This matter was heard before the Hudson County Chancery Judge, not the Law Division judge who decided the case before us on this appeal. The Chancery judge was "troubled by .... the blatant, blatant excessive overspending by the [RDC]." He enjoined further RDC spending. He believed RDC had "overspent considerably in violation of the election law." The judge also asked ELEC to "investigate whether or not there are any violations by the Cunningham Inaugural Committee and the Reform Democratic Committee." ELEC has not acted on the matter, apparently awaiting our decision in this case.

In June, Cunningham, Manzo and Chiappone won the primary election. The appellants petitioned for and received a recount, but it did not yield results contrary to the initial count. After the recount, the results were, for Senate: (1) Cunningham (10,715 votes); (2) Smith (8,630); and (3) Vincent Militello, not a party to this case (3,004). For Assembly, the results were: (1) Chiappone

---

Assembly shall be deemed to be the same elective public offices in a legislative district; the offices of member of the board of chosen freeholders and county executive shall be deemed to be the same elective public offices in a county; and the offices of mayor and member of the municipal governing body shall be deemed to be the same elective public offices in a municipality.

(11,154); (2) Manzo (11,134); (3) Doria (10,519); and Perez–Cinciarelli (9,624).

On July 25 appellants filed this verified petition contesting the election under *N.J.S.A.* 19:29–1h. In the complaint they incorporated allegations that The Cunningham Democratic Team, Cunningham for Senate, JCF, RDC, and others, in raising and spending money on behalf of Cunningham, Manzo, and Chiappone, had:

routinely ignored and violated the filing requirements of [the Act] and have failed to file those reports which would permit ELEC, opposing candidates, or the public to know the names of contributors, the nature and amount of contributions and expenditures, and the other information disclosed by the required forms.

In addition, appellants stated these individuals and entities "directed, coordinated, authorized and allowed campaign spending to occur in violation of the law," and that "such spending was in excess of $50,000." Appellants asserted that the respondents' "knowing, intentional, negligent, or grossly negligent overspending, failure to report, violation of the laws and court orders, had a significant impact on the election and voters which was sufficient to change the results and outcome of the election."

After the filing of the election contest petition, respondents moved to dismiss the petition. They argued, among other things, that ELEC had exclusive jurisdiction of the complaint, that appellants must exhaust administrative remedies, and that the complaint failed to state a claim under *R.* 4:6–2(e). On August 14, 2003 the Law Division judge denied the motions. He refused to transfer the case to ELEC.

In early September 2003 the respondents again moved to dismiss the charges under the Act, terming their motion an "involuntary dismissal" or, in the alternative, "summary judgment." On September 11, 2003, after hearing testimony, the trial judge dismissed the action. He ruled (1) relevant provisions of the Act do not apply to primary elections; and (2) even if such provisions did apply and there were violations, appellants did not establish a "*prima facie* case" of any violation of the Act sufficient to void the election.

## II

A review of the Act's sanctions for violations aids in understanding this matter. The Act has various sanctions for violations of contribution limits. *N.J.S.A.* 19:44A–21a makes it a fourth-degree crime for a person to violate *N.J.S.A.* 19:44A–11.3, the relevant contribution restriction in this case, if the person acts purposely and with the intent to conceal or misrepresent contributions received to aid or promote the nomination of any candidate for public office, among other things. If that person is guilty of this offense, *N.J.S.A.* 19:44A–21c states the nomination for election or the election of the person to office is void. *N.J.S.A.* 19:44A–21 speaks of crimes, suggesting an aggrieved candidate or someone else must press a criminal charge.

There are also sanctions for contribution violations in *N.J.S.A.* 19:44A–22, which provides for substantial monetary penalties of up to $100,000 against "[a]ny person who willfully and intentionally makes or accepts any contribution in violation of . . . [the relevant restriction on campaign contributions, *N.J.S.A.* 19:44A–11b]." Regulatory monetary penalties are contained in *N.J.S.A.* 19:44A–22(a)(1) ($3,000 for each regulatory violation). *N.J.S.A.* 19:44A–22f requires any person holding office to forfeit the office if the illegal contribution given or received exceeds $50,000 and the violation had a significant impact on the outcome of the election. After ELEC makes findings of the applicable penalties, *N.J.S.A.* 19:44A–22g authorizes a court to enforce the penalties in a summary proceeding conducted under the penalty enforcement law, *N.J.S.A.* 2A:58–10 and –11. Under *N.J.S.A.* 19:44A–6b, ELEC has "the authority to initiate a civil action in any court" to enforce compliance with the Act by injunction or recovery of monetary penalties.

Finally, *N.J.S.A.* 19:44A–22.1, mentioned earlier, authorizes a candidate in an ongoing campaign to file a summary action in the Superior Court to enjoin a political committee or continuing political committee from further violations of the Act.

### III

We now turn to the issue of whether the Act applies to primary elections. The appellants alleged that violations of the Act occurred when JCF and RDC, the continuing political committees, made contributions to Cunningham for Senate and The Cunningham Democratic Team during the primary far in excess of legal limits. The provisions of the Act that regulate contributions of continuing political committees to candidate committees and joint candidate committees are found in *N.J.S.A.* 19:44A–11, specifically subsection *N.J.S.A.* 19:44A–11.3.

*N.J.S.A.* 19:44A–11.3 is a very complex provision. *N.J.S.A.* 19:44A–11.3b addresses contributions that continuing political committees make to candidate committees or joint candidate committees. By contrast, *N.J.S.A.* 19:44A–11.3a addresses individual contributions, and *N.J.S.A.* 19:44A–11.3c deals with a candidate's contributions to another candidate or joint candidates committee.

*N.J.S.A.* 19:44A–11.3b states:

b. (1) No political committee or continuing political committee shall:

(a) pay or make any contribution of money or other thing of value to a candidate who has established *only a candidate committee,* his campaign treasurer, deputy campaign treasurer or candidate committee, other than a candidate for nomination for election or for election for the office of Governor, which in the aggregate exceeds $5,000 per election, or

(b) pay or make any contribution of money or other thing of value to candidates who have established *only a joint candidates committee,* their campaign treasurer or deputy campaign treasurer, or the joint candidates committee, which in the aggregate exceeds $5,000 per election per candidate, or

(c) pay or make any contribution of money or other thing of value to a candidate who has established *both a candidates committee and a joint candidates committee,* the campaign treasurers, deputy campaign treasurers, or candidate committee or joint candidates committee, which in the aggregate exceeds $5,000 per election.

No candidate who has established *only a candidate committee,* his campaign treasurer, deputy campaign treasurer or candidate committee, other than a candidate for nomination for election or for election for the office of Governor, shall knowingly accept from any political committee or continuing political committee any contribution of money or other thing of value which in the aggregate exceeds $5,000 per election, and

no candidates who have established *only a joint candidates committee,* their campaign treasurer, deputy campaign treasurer, or joint candidates committee, shall knowingly accept from any such source any contribution of money or other thing of value which in the aggregate exceeds $5,000 per election per candidate, and

no candidate who has established *both a candidate committee and a joint candidates committee,* the campaign treasurers, deputy campaign treasurers, or candidate committee or joint candidates committee shall knowingly accept from any such source any contribution of money or other thing of value which in the aggregate exceeds $5,000 per election.

[paragraphing supplied; emphasis supplied]

The trial judge ruled that these provisions do not apply to primary elections. He gave various reasons for that conclusion, including (a) a statutory distinction between the phrases "election" and "any election"; (b) a clause in *N.J.S.A.* 19:44A–11.3b(1)(a) which he interpreted as an affirmative exclusion of primaries from the provision; and (c) an analysis of the Act's sanctions provisions.

First, the trial judge cited *N.J.S.A.* 19:1–1, the definition section for Title 19. *N.J.S.A.* 19:1–1 is not part of the Act; it is part of the general Election Code. Following *N.J.S.A.* 19:1–1, the judge suggested that when the Legislature used the phrase "election" in the Act, it referred only to general elections, but when it used "any election," the Legislature referred to both general and primary elections. He said,

It is clear that the campaign finance and the Campaign Contributions and Expenditures Reporting Act refers to any election and therefore generally is intended to cover all elections. However, that does not mean that the legislature has abandoned the distinction in its operative provisions between an election, which references public office [and] any election, which includes primaries.

And the view of the operative provisions of the Act makes clear that the legislature carefully differentiated between provisions relating to an election by which it meant election to public office and nominations which relate to primary contests.

As examples, the judge cited *N.J.S.A.* 19:44A–6d and *N.J.S.A.* 19:44A–7.1. *N.J.S.A.* 19:44A–6d states "If the *nomination for or election* to any public office or party position becomes void ...." (emphasis supplied) *N.J.S.A.* 19:44A–7.1 limits "contributions, expenditures and other amounts relating to campaigns for *nomination or election* to the office of governor." (Emphasis supplied)

Considering *N.J.S.A.* 19:1–1, 19:44A–6d, and 19:44A–7.1, the trial judge reasoned that if *N.J.S.A.* 19:44A–11.3b was meant to apply to primaries, the Legislature would have specified the provision applies to "any election" or to a candidate's "nomination for election." But since *N.J.S.A.* 19:44A–11.3b deals with limits "per election," the trial judge concluded it did not apply to primaries. In addition, he said the various sections of *N.J.S.A.* 19:44A–11.3b:

all include the phrase "nomination for election" in those specific circumstances where the Act is intended to operate in the context of a primary and one can only conclude that when that phrase is omitted in the very same legislative text, the application is intended to be limited to an election for public office.

A second and related reason for the trial judge's conclusion that *N.J.S.A.* 19:44A–11.3b did not apply to primaries was because of a specific clause in the provision which he felt evinced a legislative intent to exclude primaries. He cited *N.J.S.A.* 19:44A–11.3b(1)(a), which contains the phrase "other than a candidate for nomination for election or for election for the office of Governor." To the trial judge, the existence of this "exclusionary clause" showed the "legislature is precise with respect to those elections as to which there is a limitation on contributions and as to those as to which there is not."

Finally, the trial judge concluded that "the most compelling indication" that the contribution limits of *N.J.S.A.* 19:44A–11.3b do not apply to primaries is found in *N.J.S.A.* 19:44A–22. That section addresses the sanctions for violations of *N.J.S.A.* 19:44A–11.3 generally. *N.J.S.A.* 19:44A–22f states:

a person *holding any public office* shall forfeit that public office if the Election Law Enforcement Commission determines that the cumulative total amount of the illegal contribution was more than $50,000.00 and that the violation had a significant impact on the outcome of the election.

[emphasis supplied]

The judge reasoned that *N.J.S.A.* 19:44A–11.3b would not apply to primaries because "there is no consequence [in *N.J.S.A.* 19:44A–22f] ascribed to the winner of a primary who is guilty of similar conduct." He said it was "clear that the reason the successful nominee does not suffer the forfeiture of an election victory by

ELEC is because the restrictions in 11.3 do not apply to election primaries."

Although he ruled that the continuing political committee contribution limits of *N.J.S.A.* 19:44A–11.3b do not apply to primaries, the judge nevertheless found that the reporting provisions on such contributions at *N.J.S.A.* 19:44A–8(b)(2) do apply. Even though the apparent purpose of having reporting provisions is to expose contribution violations, the judge concluded that the reporting requirement during primaries works to "shed some light on the money spent during the primary process without impinging on any first amendment rights which are implicated when money is spent in support of a candidate."

We are not persuaded by the arguments based on the exclusionary clause in *N.J.S.A.* 19:44A–11.3b(1)(a) and the sanctions provision of *N.J.S.A.* 19:44A–22f. There are several reasons why we reject the trial judge's analysis on the exclusionary clause of *N.J.S.A.* 19:44A–11.3b(1)(a). First, the judge interpreted "other than a candidate for nomination for election or for election for the office of Governor" as excluding (1) a primary election and (2) an election for the office of Governor. As ELEC points out, the phrase is properly interpreted as excluding (i) primary elections *for Governor* and (2) general elections *for Governor*. ELEC contends that the "simple reason" for this clause was that "other provisions of the Act established separate and different contribution limits for gubernatorial candidates. Therefore, gubernatorial candidates for nomination and election had to be excepted from the operation of *N.J.S.A.* 19:44A–11.3." We find this argument persuasive. Indeed, the Legislature has reserved for special coverage the regulation of contributions and expenditures in gubernatorial campaigns. *See N.J.S.A.* 19:44A–27 to –47.

Consideration of this exclusionary provision, properly construed, actually supports the applicability of Section 11.3b(1) to primaries. If the Legislature explicitly excluded only gubernatorial elections, then it must not have intended to exclude primaries. *See Higgins v. Pascack Valley Hospital,* 158 *N.J.* 404, 419, 730 *A.*2d 327 (1999).

Even assuming the judge's interpretation of the exclusionary clause is correct, that interpretation would not apply to the whole of *N.J.S.A.* 19:44A–11.3b(1); nor would it apply to the facts of this case. Section 11.3b(1) is organized according to three different types of continuing political committee contributions: (i) continuing political committee contributions "to a candidate who has established only a candidate committee" (*N.J.S.A.* 19:44A–11.3b(1)(a)); (ii) continuing political committee contributions "to candidates who have established only a joint candidates committee" (*N.J.S.A.* 19:44A–11.3b(1)(b)); and (iii) continuing political committee contributions. "to a candidate who established both a candidate committee and a joint candidates committee." (*N.J.S.A.* 19:44A–11.3b(1)(c)) The exclusionary clause is located only in Section 11.3b(1)(a). The trial judge did not explain why the exclusionary clause should carry over to Sections 11.3b(1)(b) and (c), which do not contain the clause. Also, the trial judge did not explain why the exclusionary clause should carry over to the latter portion of Section 11.3b(1), which deals with the liability of the candidates who receive such monies. This case concerns the liability of the candidates, not the liability of continuing political committees, which Sections 11.3(b)(1)(a), (b), and (c) cover.

Similarly, the trial judge's conclusion that *N.J.S.A.* 19:44A–22f signals a legislative intent that Section 11.3b(1) does not apply to primaries is unconvincing. The trial judge took an overly narrow view of the Act's penalty provisions. While it is true that Section 22f deals with a person in office who violates Section 11.3b(1), Section 22f is not the only section that lists the sanctions for Section 11 violations. *N.J.S.A.* 19:44A–21 deals directly with violations of Section 11.3b(1) in primary elections. *N.J.S.A.* 19:44A–21a states:

Any person who purposely and with intent to conceal or misrepresent contributions given or received or expenditures made or incurred to aid or promote *the nomination*, election, or defeat of any candidate for public office or party position, or to aid or promote the passage or defeat of a public question in any election, or to aid the dissemination of political information in connection with any election makes or accepts any contribution or makes or incurs any expenditure in violation of sections 7, 11, or· 20 of this act is guilty of a crime of the fourth degree.

[emphasis supplied]

"Section 11" of the Act is *N.J.S.A.* 19:44A–11. Moreover, *N.J.S.A.* 19:44A–21c states:

The *nomination for* or election *to any office of any candidate* who is guilty of any violation within the description of [*N.J.S.A.* 19:44A–21a or b] of this section shall be void, and the office shall be filled as required by law in the case of a vacancy. . . .

[emphasis supplied]

If we consider the Act's sanctions to determine whether Section 11.3b(1) applies to primaries, we must conclude that *N.J.S.A.* 19:44A–21a and b clearly show that Section 11 applies to primaries, rather than conclude that *N.J.S.A.* 19:44A–22f suggests, albeit tenuously, that Section 11 does not cover primaries.

Probably the trial judge's best support for why *N.J.S.A.* 19:44A–11.3b(1) does not apply to primary elections is his suggestion that there is a distinction between "election" and "any election." His rationale was that where the Legislature intended the Act to apply to primary elections, it specified "any election" or "nomination for election," but that Section 11.3b(1) only deals with contribution limits "per election." We reject this conclusion for several reasons.

First, if we do not interpret Section 11.3b to apply to primaries, no sense can be made of *N.J.S.A.* 19:44A–21a and c, addressing contributions "to aid or promote the nomination, election or defeat of any candidate for public office or party position." It is very unlikely that the Legislature would provide sanctions for a Section 11.3b violation during a primary campaign but not intend Section 11.3b to apply to primaries.

Second, one need not refer to the definitions section of *N.J.S.A.* 19:1–1 to determine the meaning of "election" in Section 11.3b. We look to Section 11.3b(2), which directly implies that the Section 11.3b(1) is meant to apply to primaries. Section 11.3b(2) states:

The limitation upon the knowing acceptance by a candidate, campaign treasurer, deputy campaign treasurer, candidate committee or joint candidates committee of any contribution of money or other thing of value from a political committee or continuing political committee under the provisions of paragraph (1) of this subsection shall also be applicable to the knowing acceptance of any such contribution from the county committee of a political party by a candidate or the campaign

treasurer, deputy campaign treasurer, candidate committee or joint candidates committee of a candidate for any elective public office in another county *or, in the case of a candidate for nomination for election or for election to the office of member of the Legislature,* in a legislative district in which, according to the federal decennial census upon the basis of which legislative districts shall have been established, less than 20% of the population resides within the county of that county committee. In addition, all contributor reporting requirements and other restrictions and regulations applicable to a contribution of money or other thing of value by a political committee or continuing political committee under the provisions of P.L.1973, c. 83 (C. 19:44A–1 et seq.) shall likewise be applicable to the making or payment of such a contribution by such a county committee.

[emphasis supplied]

From the emphasized portions of Section 11.3b(2), we conclude that "subsection (1)", *i.e.* Section 11.3b(1), is meant to apply to primaries for the State Legislature. The provision states that the receiving limits, in the latter portion of Section 11.3b(1), shall apply when a county committee from a different county makes a contribution. The Legislature adds a special proviso for the case where there is a county committee contribution to a primary or general election candidate for the Legislature, but the committee's county has less than twenty-percent of the district. If the Legislature needed to make a special proviso in "the case of a candidate for nomination for election or for election to the office of member of the Legislature," then the Legislature assumed Section 11.3b(1) covers that "case."

Third, the trial judge's statutory examples do not support his conclusion that the "the view of the operative provisions of the Act makes clear that the legislature carefully differentiated between provisions relating to an election by which it meant election to public office and nominations which relate to primary contests." He cited *N.J.S.A.* 19:44A–6d, which states that:

If the nomination for or election to any public office or party position becomes void under the terms of [*N.J.S.A.* 19:44A–21c], the withholding or revocation of his certificate of election, the omission of his name from the ballot or the vacation of the office into which he has been inducted as a result of such void election, as the case may be, shall be subject to the provisions of chapter 3, articles 2 and 3, of this Title (R.S. 19:3–7 et seq.).

The trial judge used this provision to conclude that if the Legislature wanted Section 11.3b to apply to primaries, it could have

specifically stated "nomination for election" as above. But, the judge did not consider the significance of the reference in *N.J.S.A.* 19:44A–6d to *N.J.S.A.* 19:44A–21c. As previously discussed, Section 21c of the Act deals with violations of Section 11.3b in primary or general elections. Hence, the very subject of *N.J.S.A* 19:44A–6d includes Section 11.3b violations in primaries.

The judge also cited *N.J.S.A.* 19:44A–7.1 for support. Section 7.1 refers to "nomination or election to the office of governor." This is the same as the language of Section 11.3b(1)(a) which, as ELEC observes, refers to gubernatorial primaries and gubernatorial general elections. Gubernatorial elections are excepted because the Legislature provided them with special treatment at *N.J.S.A.* 19:44A–27 to –47.

In sum, the judge's statutory examples do not support the argument that the Legislature expressly provided where the Act is to apply to primaries, and that where the Legislature did not so provide, primaries are excluded.

There are additional reasons why we decide that Section 11.3b(1) applies to primary elections. First, the narrowing distinction between "election" and "any election" is contrary to the legislative direction that courts should interpret the Act generously with respect to the nomination and election process. *N.J.S.A.* 19:44A–23 states:

> This act shall be construed liberally to effectuate the legislative intent and as complete and independent authority for the performance of each and every act and thing herein authorized.

*N.J.S.A.* 19:44A–2 further provides:

> It is hereby declared to be in the public interest and to be the policy of the State to limit political contributions and to require the reporting of all contributions received and expenditures made to aid or promote the *nomination, election or defeat* of any candidate for public office or to aid or promote the passage or defeat of a public question in any election and to require the reporting of all contributions received and expenditures made to provide political information on any candidate for public office, or on any public question.
>
> [emphasis supplied]

When there is doubt as to whether the Act covers a particular situation, *N.J.S.A.* 19:44A–23 and 19:44A–2, taken together, urge

an interpretive presumption of coverage. By contrast, the judge's interpretation of Section 11.3b assumes the contrary: the Act's policy is one of noncoverage where there is doubt. We have no doubt here about the legislative intent, but even if we did, contribution and expenditure coverage is the preferred goal.

As an intervenor on appeal, ELEC points out that when the Act was adopted in 1993, the Legislature directed ELEC to "publish any rule and to take any administrative action whatsoever, necessary to insure that the provisions of this 1993 amendatory and supplementary act shall be applicable to the June, 1993 primary election." *See N.J.S.A.* 19:44A–6 (Historical Note). Based on this language, ELEC argues "the Legislature explicitly directed the Commission to take emergent steps to apply the newly-enacted contribution limits to candidates in the imminent 1993 primary election." The Legislature could not have been referring only to the 1993 gubernatorial primary election, since contribution limits for gubernatorial primaries were already established.

ELEC further relies upon *N.J.S.A.* 19:44A–7.2a, which specifically states:

> Not later than December 1 of each year preceding any year in which a general election is to be held to fill the office of Governor for a four-year term, the Election Law Enforcement Commission shall adjust the amount, set forth in subsection b. of this section, *which shall be applicable under [19:44A–1 et. seq.] to primary and general elections for any public office other than the office of Governor, to limitations on contributions to and from political committees, continuing political committees, candidate committees, joint candidates committees, political party committees and legislative leadership committees and to other amounts,* at a percentage which shall be the same as the percentage of change that the elections for the office of Governor held in the third year preceding the year in which that December 1 occurs, pursuant to [19:44A–7.1], and any amount so adjusted shall be rounded in the same manner as provided in that section.

This provision directs ELEC to adjust the contribution limits which shall be applicable "to primary and general elections for any public office other than the office of Governor, to limitations on contributions to and from .... continuing political committees." The limitations on contributions to and from continuing political committees are stated to apply to primary elections.

ELEC also maintains that "[s]ince the 1993 Amendments, the Commission has consistently interpreted the [Act] to require application of contribution limits to non-gubernatorial candidates in all elections, including primary elections," and, citing *New Jersey Tpk. Auth. v. American Federation of State, County, and Municipal Employees*, 150 *N.J.* 331, 351, 696 *A.*2d 585 (1997), and *Merin v. Maglaki*, 126 *N.J.* 430, 436–37, 599 *A.*2d 1256 (1992), ELEC urges that "[s]ubstantial deference is granted by New Jersey courts to an agency's interpretation of its own act." This expression is entirely consistent with the deference generally accorded to administrative agencies in construing their enabling acts, *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 *U.S.* 837, 843, 104 *S.Ct.* 2778, 81 *L.Ed.*2d 694 (1984), most recently followed in *Barnhart v. Thomas*, 540 *U.S.* ——, ——, 124 *S.Ct.* 376, 157 *L.Ed.*2d 333 (2003) (slip op. at 5) ("we must defer to a reasonable construction by the agency charged with its implementation"). We conclude that ELEC's construction "is an entirely reasonable interpretation of the Act." *Id.* at ——, 124 S.Ct. 376 (slip op. at 10). ELEC stresses that, prior to the effective date of the Act in 1993, it "announced publicly its plans to implement contribution limits in the 1993 primary election." ("Executive Director Herrmann noted that Phase 1 of the [Act's implementation plan] would cover the primary election." ELEC Public Session Minutes, March 15, 1993 at 3.)

ELEC states that when it adjusted the contribution limits in 1996, at no point in the rulemaking process did it receive a public response to the application of contribution limits to primary elections, nor did the Legislature object or exercise a "veto" as it had the authority to do under *N.J.S.A.* 52:14B–4.1 or *N.J. Const.* art. V, § 4, § 6. ELEC submits that it has consistently ruled in advisory opinions since 1994 that contribution limits apply to primary elections. *See N.J.S.A.* 19:44A–6f; Advisory Opinion No. 10–1994 (ELEC advised a 1994 primary election candidate that post-primary election contributions received to pay costs of post-election litigation were subject to 1994 primary election contribu-

tion limits); Advisory Opinion No. 06–1995 (ELEC instructed 1995 special primary election candidate for State Senate that primary election contribution limits would apply to candidacy); Advisory Opinion No. 07–1995 (ELEC advised candidate, who began to accept contributions for 1995 primary election candidacy but did not pursue it, that candidate must observe 1995 primary election contribution limits).

There are only a few cases interpreting the Act, but one, *Markwardt v. New Beginnings et al.*, 304 *N.J.Super.* 522, 701 *A.*2d 706 (App.Div.1997), strongly supports the proposition that the Act's limitations on continuing political committee contributions extend to primaries. The plaintiffs were two candidates for the Voorhees Township Committee in the 1996 general election. They brought a summary action in the Law Division challenging contributions their opponents received from two continuing political committees. The defendants, who later won the general election, claimed the plaintiffs lacked standing to bring a summary action under *N.J.S.A.* 19:44A–22.1. They argued that the contested contributions were made immediately prior to the Democratic primary election, and because the plaintiffs were not parties in the primary, they did not have standing.

We rejected the defendants' argument. In our opinion, Judge Baime said:

The statute [*N.J.S.A.* 19:44A–22.1] does not draw a distinction between primary and general elections, but only refers to candidates generally. Clearly, the plaintiffs were candidates for public office under the Act's definitional section. *N.J.S.A.* 19:44A–3(c). Moreover, the challenged contributions were made in an uncontested primary election, and were made "in furtherance of the defeat" of plaintiffs, who were candidates in the general election. Further, at least a portion of the monies were ultimately transferred for the use of [the defendants] in the general election.

The Act's restrictions on campaign contributions may not be so facilely evaded. We construe *N.J.S.A.* 19:44A–22.1 consonant with its obvious purpose—to afford an aggrieved candidate a judicial remedy in order to prevent irreparable injury. We are entirely satisfied that plaintiffs had the requisite standing to seek judicial relief under the statute.

[*Markwardt*, 304 *N.J.Super.* at 537, 701 *A.*2d 706.]

Thus, our *Markwardt* court interpreted the Act to regulate continuing political committee contributions in primary elections, and took the further step of declaring that a candidate who is not entered in that primary can challenge the legality of those contributions.

Interpretation of *N.J.S.A.* 19:44A–11.3b, interpretation of that section's accompanying provisions, the Act's guidelines for construction, legislative history, administrative practice and opinions, and case law compel us to reverse and rule that *N.J.S.A.* 19:44A–11.3b applies to primary elections.

### IV

■ We now turn to the jurisdictional aspects. We conclude that the Legislature intended that ELEC have primary jurisdiction over Act complaints not brought under either *N.J.S.A.* 19:44A–21 (criminal complaint) or 19:44A–22.1 (pre-election summary action). *N.J.S.A.* 19:44A–22d states:

> [ELEC] may designate a hearing officer to hear complaints of violations of this act. Such hearing officer shall take testimony, compile a record and make factual findings, and shall submit the same to the commission, which shall have power to assess penalties within the limits and under conditions prescribed in [*N.J.S.A.* 19:44A–22b and c]. The commission shall review the record and findings of the hearing officer, but it may also seek additional testimony as it deems necessary. The commission's determination shall be by majority vote of the entire authorized membership thereof.

The Legislature did provide for Superior Court jurisdiction over Act violations without ELEC involvement, specifically where: (i) the case was based on a criminal complaint under Section 21, or (ii) the case was a pre-election summary action proceeding under Section 22.1. Therefore, the Act addresses three different situations. There is the non-criminal complaint of an Act violation, which ELEC considers; there is the criminal complaint, which a court considers; and there is the pre-election summary action proceeding, which a court considers.

Notwithstanding this language in the Act, the present case proceeded in the Law Division on the theory that a Superior Court judge can adjudicate an Act-based complaint as if it were an

election contest under *N.J.S.A.* 19:29–1h. That statute contains the broad statement that a person can contest a primary or general election for "[t]he paying, promise to pay or expenditure of any money or other thing of value or incurring of any liability in excess of the amount permitted by this title for any purpose or in any manner not authorized by this title [Title 19]." Because the trial judge decided he had direct jurisdiction over the case under the election contest statute, he confronted the procedural questions normally associated with civil actions. He ultimately ruled that the plaintiffs had not made out a case to set aside the election. We agree with his decision on the merits.

Here the trial judge found a contestant must prove a "nexus" between a violation and the outcome of the election before the election is voided. But in making that ruling, the judge made no distinction between the post-election criminal complaint under the Act (*N.J.S.A.* 19:44A–21) and a post-election complaint before ELEC (*N.J.S.A.* 19:44A–22). If, for example, the contestant filed a criminal complaint and a jury found the person guilty under *N.J.S.A.* 19:44A–21a, *N.J.S.A.* 19:44A–21c provides that no finding of a nexus is necessary. The election is void without qualification.

In addition, in applying *N.J.S.A.* 19:44A–22e, the trial judge made no finding as to whether The Cunningham Team or its individual members "willfully and intentionally" accepted a contribution in violation of the Act. Instead, the judge applied *N.J.S.A.* 19:3–9, which is part of the Election Code but not part of the Act. The judge similarly addressed the applicability of *N.J.S.A.* 19:44A–22f, which pertains to the forfeiture of public office if the illegal contributions exceeded $50,000 and "had a significant impact on the outcome of the election." The judge again considered *N.J.S.A.* 19:3–9, not the Act, and concluded that such contributions must be "sufficient to change the result," perhaps a different standard than the "significant impact" standard. The judge essentially replaced the Act's own violation provisions of *N.J.S.A.* 19:44A–22 with provisions outside the Act, justifying such replacement on the grounds that the case proceeded under *N.J.S.A.*

19:29–1h. The judge also assumed that the continuing political committees made illegal contributions in excess of the 2003 legal limit for the Cunningham slate but did not acknowledge that this would justify a penalty, even if *N.J.S.A.* 19:44A–22f does not mandate forfeiture.

The application of the Act should not turn on whether one files a Superior Court election contest, a criminal complaint, or an ELEC complaint. Rather than allow a complaint of an Act violation to proceed as an election contest, the trial judge should apply the same standards ELEC would apply on a proceeding under *N.J.S.A.* 19:44A–22d, even if the complaint is one for summary injunctive relief in the Superior Court under *N.J.S.A.* 19:44A–22.1. Under this approach, the trial judge recognizes that while *N.J.S.A.* 19:29–1h, broadly interpreted, might support the maintenance of an election contest on the grounds that there is an Act violation, the better policy is to adjudicate the violation though the procedures the Legislature has expressed in the Act. The appropriate standards which govern are those under the Act, not standards applicable to the election contest statute and Title 19 statutes outside the Act. This will foster a uniform application of the substantive provisions of the Act. If a party seeks to invoke *N.J.S.A.* 19:44A–21a and b, that party is still free to file a separate criminal complaint.

As applied to this type of case, a trial judge should (a) deem a verified petition that contains alleged Act violations as if it were a complaint under *N.J.S.A.* 19:44A–22d; (b) transfer the case, or the relevant counts containing Act violations, to ELEC, to whom the Legislature in our view assigned primary jurisdiction, *see R.* 1:13–4, unless the judge determines to keep jurisdiction after an appropriate analysis; and (c) if the judge decides to retain jurisdiction under the aegis of *N.J.S.A.* 19:29–1h, apply the standards ELEC would apply if the case was before ELEC.

The judge should engage in a primary jurisdiction analysis before retaining the case. The principles governing the ability of a court to maintain jurisdiction over a matter in which an agency

has primary jurisdiction were discussed in *Muise v. GPU, Inc.*, 332 *N.J.Super.* 140, 753 *A.*2d 116 (App.Div.2000). *See generally* 37 *New Jersey Practice, Administrative Law & Practice* § 7.6, at 365–367 (Steven L. Lefelt) (2nd ed. 2000 & Supp.2003). *Muise* involved a class action complaint that electricity customers filed against GPU, Inc. and related entities for damages from power outages during a week-long heat wave in July 1999. *Id.* at 146–47, 753 *A.*2d 116. The defendants moved to dismiss the complaint in favor of the primary jurisdiction of the Board of Public Utilities. We affirmed the Law Division judge's decision to retain jurisdiction.

In reaching our conclusion, we observed:

> Primary jurisdiction is defined as the circumstance in which a "court declines original jurisdiction and refers to the appropriate body those issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Daaleman v. Elizabethtown Gas Co.*, 77 *N.J.* 267, 269 n. 1, 390 *A.*2d 566 (1978). The doctrine is related to the practice of requiring the exhaustion of administrative remedies. *Boldt v. Correspondence Management, Inc.*, 320 *N.J.Super.* 74, 83, 726 *A.*2d 975 (App.Div.1999) (quoting *Boss v. Rockland Elec. Co.*, 95 *N.J.* 33, 40, 468 *A.*2d 1055 (1983)).
>
> In primary jurisdiction, "the case is properly before the court, but agency expertise is required to resolve the questions presented"; by contrast, when a court relies on exhaustion, it "is saying that the case ought to have been brought before the administrative agency in the first place." *Id.* at 83–84, 726 *A.*2d 975. *See Village of Ridgefield Park v. New York, S & W Ry. Corp.*, 318 *N.J.Super.* 385, 405–07, 724 *A.*2d 267 (App.Div.), *modified*, 163 *N.J.* 446, 750 *A.*2d 57 (2000).
>
> [332 *N.J.Super.* at 158–159, 753 *A.*2d 116.]

We recognized that one purpose of primary jurisdiction was "to allow an agency to apply its expertise to questions which require interpretation of its regulations." 332 *N.J.Super.* at 159, 753 *A.*2d 116 (citing *IPCO Safety Corp. v. WorldCom, Inc.*, 944 *F.Supp.* 352, 357 (D.N.J.1996); *Campione v. Adamar of N.J.*, 155 *N.J.* 245, 264, 714 *A.*2d 299 (1998)). The other main purpose "is to preserve uniformity in the interpretation and application of an agency's regulations." 332 *N.J.Super.* at 160, 753 *A.*2d 116. We quoted *Campione*, which involved the issue in the context of the Casino Control Commission's regulation of the casino industry:

> The pervasiveness of the regulatory scheme controlling the casino industry indicates that the Legislature intended to invest the [Casino Control Commission] with

primary jurisdiction to regulate the casino industry. To the extent that the resolution of a plaintiff's claim depends on an interpretation of the Act or administrative regulations, the CCC should have the first opportunity to provide that interpretation. A referral to the CCC should assure the resolution of the controversy consistent with the views of the entity best positioned to consider the matter. Retaining primary jurisdiction in the courts could dislocate the intricate regulatory structure governing a sensitive industry. Permitting courts and juries across the State to interpret statutory and administrative regulations could introduce confusion where uniformity is needed. The lack of uniform interpretations, in turn, could [a]ffect the stability of the industry.

[*Muise*, 332 *N.J.Super.* at 160, 753 *A*.2d 116 (quoting *Campione*, 155 *N.J.* at 264, 714 *A*.2d 299) ]

We referred to "a general test for when a court should defer to an agency's primary jurisdiction." *Muise*, 332 *N.J.Super.* at 160, 753 *A*.2d 116. Deference is appropriate only if "to deny the agency's power to resolve the issues in question would be inconsistent with the statutory scheme which vested the agency with the authority to regulate [the] industry or activity it oversees." *Ibid.* (quoting *U.S. ex rel. Haskins v. Omega Inst., Inc.*, 11 *F.Supp.*2d 555, 561 (D.N.J.1998)). We described four prongs of the test:

The factors to be considered in deciding whether to invoke the doctrine include 1) whether the matter at issue is within the conventional experience of judges; 2) whether the matter is peculiarly within the agency's discretion, or requires agency expertise; 3) whether inconsistent rulings might pose the danger of disrupting the statutory scheme; and 4) whether prior application has been made to the agency.

[*Muise*, 332 *N.J.Super.* at 160, 753 *A*.2d 116 (citing *Boldt*, 320 *N.J.Super.* at 85, 726 *A*.2d 975 (citing *IPCO*, 944 *F.Supp.* at 356)) ]

We upheld the trial judge's decision not to transfer the entire case to the Board of Public Utilities because the negligence claim was properly before a court. We also ruled that the trial judge should transfer future issues arising in the litigation which involve the agency's expertise to the agency. 332 *N.J.Super.* at 161–66, 753 *A*.2d 116.

While in the case now before us the judge did address the issue of ELEC referral in an opinion on an earlier motion, he did not specifically perform a *Muise* analysis. He believed that, notwithstanding the ELEC's apparent jurisdiction under the Act, *N.J.S.A.* 19:29–1h provided a separate basis for his jurisdiction. Primary jurisdiction principles are applicable here because the

judge conceivably had a basis for jurisdiction, as opposed to an analysis under the exhaustion of remedies doctrine, where a court has no jurisdiction at all. Nevertheless, we conclude prudential considerations dictate that the trial judge ordinarily should allow ELEC to hear complaints of Act violations.

On the first prong, while courts have conventional experience with election contests, they do not appear to have much experience with applying the Act in a post-election situation. On the second prong, ELEC has extensive experience dealing with the Act; indeed, the agency's very purpose is to interpret and apply it. *N.J.S.A.* 19:44A–6b states:

> It shall be the duty of the commission to enforce the provisions of this act, to conduct hearings with regard to possible violations and to impose penalties; and for the effectual carrying out of its enforcement responsibilities the commission shall have the authority to initiate a civil action in any court of competent jurisdiction for the purpose of enforcing compliance with the provisions of this act or enjoining violations thereof or recovering any penalty prescribed by this act. Without limiting the generality of the foregoing, the commission is authorized and empowered to:
>
> \* \* \*
>
> (7) Ascertain whether candidates, committees, organizations or others have failed to file reports or have filed defective reports . . . .
>
> (8) Ascertain the total expenditures for candidates and determine whether they have exceeded the limits set forth in this act,; notify candidates, committees or others if they have exceeded or are about to exceed the limits imposed;
>
> (9) Hold public hearings, investigate allegations of any violations of this act, and issue [subpoenas] for the production of documents and the attendance of witnesses;
>
> (10) Forward to the Attorney General or to the appropriate county prosecutor information concerning any violations of this act which may become the subject of criminal prosecution or which may warrant the institution of other legal proceedings by the Attorney General.

On the second prong, we especially consider how the Legislature's directive at *N.J.S.A.* 19:44A–22d that ELEC hear these violations is situated between provisions giving a court authority to act, namely *N.J.S.A.* 19:44A–21 and 19:44A–22.1. No one can contend the Legislature was unaware it could grant a court the power to adjudicate when the surrounding statutes actually give a court that power. This strengthens our view that the Legislature wanted ELEC to hear these cases. The evidentiary and statutory

interpretation issues sway the third prong of the *Muise* analysis in favor of deference to the agency's jurisdiction. Finally, on the fourth prong, the record does not indicate any prior application to ELEC. This is not a situation where a party first applied to ELEC and the agency declined jurisdiction.

This also is not a situation where there was such urgency that a party would suffer irreparable harm if the court did not act. Under the Act, an assessment of penalties or the voiding of office could even occur after an alleged violator takes office. In addition, one cannot say ELEC is incapable of expediting the disposition of the case. If the Legislature thought ELEC could not render a prompt decision when exigencies demanded, it would not have designated the agency as the authority to review complaints under the Act.

Because the trial judge did not here defer to the ELEC's primary jurisdiction, we remand the case to ELEC to develop a record and utilize its expertise in interpreting the Act's provisions as to the claimed violations. The Act must be interpreted in light of its policies enunciated at *N.J.S.A.* 19:44A–2 and the interpretive principles of *N.J.S.A.* 19:44A–23, not on principles informing *N.J.S.A.* 19:29–1h. Otherwise there is the prospect of disparate evidentiary and other legal standards for Act violations depending on whether one brings an election contest under *N.J.S.A.* 19:29–1h or a complaint under the Act's internal procedures. We conclude that the judge should have transferred the case to ELEC so the agency could have exercised its primary jurisdiction.

We note that, notwithstanding the proceedings under *N.J.S.A.* 19:44A–22, the Act does not preclude any party from filing a separate criminal complaint under *N.J.S.A.* 19:44A–21. Under that statute, the State needs to show, by proof beyond a reasonable doubt, that there was an intentional violation of the Act. If so, the candidates' nominations are voided under *N.J.S.A.* 19:44A–21c.

## V

On the issue of whether alleged violations of the Act had a significant impact on the election, we have reviewed the testimony before the trial judge: the witness were Bobby Jackson, Edward Santiago, Bernard Hartnett, Matthew Burns and most notably Robert DiLella upon whose testimony the Doria team relied to establish a *prima facie* case that the alleged spending violations by the Cunningham team had a significant impact on the election. DiLella, although called by the Doria camp, was a campaign consultant for the Cunningham team. His company, SMDG, handled direct mailing for the Cunningham camp's campaign, a service allegedly paid for with funds raised and spent in excess of that allowed by the Act.

DiLella did not offer any substantial proof, expert or otherwise, that the excessive expenditures had a significant impact on the election. He felt all along that Cunningham was a strong favorite and that the district was tailor-made for him. However, he also said that he felt Cunningham's faction would likely win one Assembly seat, and the other Assembly seat was "in play." He described his strategy as to do as much as possible to bolster Cunningham, who was the anchor of his slate, Column B. DiLella said: "If we did our job, Glenn—we would move other candidates to victory." Thus, with respect to Cunningham, DiLella never really claimed to have had much of an impact. However, he seemed to claim some credit for pulling the second Assembly seat into the victory column with his mailing efforts. But his most telling commentary is his description of what he meant by "significant impact": naturally, while he thought he did a good job, he recognized that his work was only part of the campaign, which also involved television, radio, signs, "moving bodies" (i.e. getting the vote out on election day), the quality of the candidates, particularly Cunningham, and the emotional investment the people in the district had in him. In sum, DiLella's testimony was unpersuasive as to influencing the outcome of the election.

The trial judge reasonably concluded:

Doubtless money is spent in elections to gain favorable votes at the polls. However, there is no evidence in this case regarding any necessary or likely correlation between the particular dollars spent and the election results.. .

The incremental votes obtained by any excess expenditures is purely speculative.

. . .

While Mr. DiLella said he believed his literature had an effect, that was little more than a net opinion devoid of specificity or analysis. He also noted that the polls prior to the election showed Cunningham as a likely victor regardless of any serious campaign activity.

■ We agree. DiLella did not actually testify as an expert. Any opinions he gave about the so-called impact of his work, allegedly paid for with the excess spending, was both vague and conclusory. In the end, he backed off any claim of influencing the victory and put his efforts in perspective, as only one piece of an overall campaign mosaic. In its most favorable light, DiLella's testimony could not support a finding that excess expenditures had a significant impact on the outcome of the election. Thus, any claim for forfeiture of office, or nomination for office, was properly dismissed at the end of plaintiff's case and need not be relitigated. *R.* 4:37–2(b); *Dolson v. Anastasia,* 55 *N.J.* 2, 5, 258 *A.2d* 706 (1969); *see Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 539–40, 666 *A.2d* 146 (1995) (evidence so "one-sided" that one party must prevail as a matter of law).

DiLella's testimony amounted to a "net opinion," nothing more. We conclude that the Doria faction had its chance to present the case and failed in its proofs. We see no need to give the Doria team another chance before ELEC to attempt to upset the election. We find that it is not in the public interest to continue the uncertainty over the outcome of the election when the challengers, given ample opportunity, have not produced sufficient evidence to justify forfeiture of office under *N.J.S.A.* 19:44A–22(f).

## VI

In conclusion, we rule that the campaign finance law applies to primary elections, and that complaints about campaign finance violations, other than injunction actions filed during a campaign or

criminal actions, presumptively should be heard by ELEC under the doctrine of primary jurisdiction. If a complaint involves a claim for forfeiture under *N.J.S.A.* 19:44A–22(f), ELEC should refer any factual disputes to a hearing officer or to the OAL for expedited disposition and should review the decision on an accelerated basis.

In this case, there is no reliable evidence that the alleged violations had a significant impact on the election, so there is no need for ELEC to consider any forfeiture claim. We transfer the balance of the complaint to ELEC to determine whether there were any campaign finance violations and, if so, the monetary penalties. We affirm the cost award of $2280 to respondents under *N.J.S.A.* 19:29–14 because this award was unrelated to any alleged violation of the Act.

Remanded to the Election Law Enforcement Commission, as modified in part; affirmed in part.