35 A.3d 710

MARGARET NORDSTROM, PETITIONER–RESPONDENT,
v. WILLIAM "HANK" LYON, RESPONDENT–
APPELLANT.

NEW JERSEY ELECTION LAW ENFORCEMENT COMMISSION,
INTERVENOR–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 19, 2012—Decided February 7, 2012.

Before Judges FUENTES, HARRIS, and KOBLITZ.

*Richard W. Wedinger* argued the cause for appellant (*Barry, McTiernan & Wedinger,* attorneys; *Sean M. Connelly, Laurel A. Wedinger, Mr. Wedinger,* and *Matthew P. Mann,* on the brief).

*Alan J. Zakin* argued the cause for respondent Margaret Nordstrom (*Azzolini & Benedetti, L.L.C.,* attorneys; *Mr. Zakin,* on the brief).

*Carol Lynn Hoekje* argued the cause for respondent New Jersey Election Law Enforcement Commission (*Carol Lynn Hoekje,* attorney; *Ms. Hoekje, Theresa J. Lelinski, Gail L. Shanker* and *Amanda S. Haines,* on the brief).

*W. Randall Bush,* First Assistant Morris County Counsel, argued the cause for respondent Joan Bramhall, Morris County Clerk (*Daniel W. O'Mullan,* Morris County Counsel, attorney; *Mr. Bush,* on the brief).

The opinion of the court was delivered by

HARRIS, J.A.D.

This is a Title Nineteen election contest. In the immediate aftermath following the Republican Party primary election held on June 7, 2011, it appeared that newcomer William "Hank" Lyon (self-dubbed "Lyon for Conservative Freeholder") had barely defeated four-term incumbent Margaret Nordstrom by ten votes in their battle to secure the Republican nomination for Morris County Freeholder. Three months later, after the Law Division con-

cluded a trial pursuant to the election contest statute, *N.J.S.A.* 19:29–1 to –14, concerning Nordstrom's claims of voter and candidate misconduct, Lyon came away stripped of the nomination. We reverse the Law Division's annulment of Lyon's nomination because of multiple legal errors that materially contributed to the court's ultimate declaration that Lyon's "nomination is null and void."

Because Lyon should have been the Republican nominee to run in the general election held on November 8, 2011, and, instead, his defeated primary opponent—Nordstrom (after being selected to stand in Lyon's place by the Morris County Republican Committee)—won that election, we (1) remove Nordstrom as an elected member of the Morris County board of freeholders, (2) declare a vacancy in such office, and (3) order that the statutory process envisioned by *N.J.S.A.* 40:20–35.11a(a), –35.11b, and –35.11c proceed forthwith.

The Law Division invalidated the June 7 election result largely because Lyon failed to comply with reporting obligations of the New Jersey Campaign Contributions and Expenditures Reporting Act (the Reporting Act), *N.J.S.A.* 19:44A–1 to –47, specifically *N.J.S.A.* 19:44A–16(i), and its implementing regulations. Fortifying the view that the nomination was null and void under *N.J.S.A.* 19:3–7, and not saved by the mitigating effect of *N.J.S.A.* 19:3–9, the trial court also held that Lyon's campaign received (and failed to timely report) a contribution from Robert Lyon, the candidate's father, that exceeded the maximum limit of $2,600 per election. *See N.J.S.A.* 19:44A–11.3(a). Finally, the Law Division determined that it would not invalidate the entire primary election on the basis of voting irregularities although it found sufficient evidence of at least twelve (and perhaps an additional twenty) illegal votes with the potential to affect the election's outcome. It therefore determined, that if needed, it would "set aside the election results in the impacted district of Parsippany" and such other districts, if any, from which the other twenty illegal ballots

were cast. We are satisfied that these conclusions are unsupported as matters of law and warrant reversal.

I.

A.

 We derive the following facts from the record created during the nine-day bench trial conducted between August and September 2011. We adopt substantially the same factual conclusions reached by the trial court because we are mindful of, and readily observe, the principle that our scope of review of a judgment in a non-jury case is extremely limited. *Seidman v. Clifton Sav. Bank, S.L.A.,* 205 *N.J.* 150, 169, 14 *A.*3d 36 (2011). The general rule is that " 'we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]' " *In re Trust Created By Agreement Dated December 20, 1961, ex rel. Johnson,* 194 *N.J.* 276, 284, 944 *A.*2d 588 (2008) (quoting *Rova Farms Resort, Inc. v. Invest. Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974)). "While we will defer to the trial court's factual findings so long as they are supported by sufficient, credible evidence in the record, our review of the trial court's legal conclusions is de novo." *30 River Court E. Urban Renewal Co. v. Capograsso,* 383 *N.J.Super.* 470, 476, 892 *A.*2d 711 (App.Div.2006) (citing *Rova Farms, supra,* 65 *N.J.* at 483–84, 323 *A.*2d 495; *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995)).

B.

Between May and June 2011, Nordstrom and Lyon campaigned to become the standard bearer for the Republican Party in the general election for the office of Morris County Freeholder. After the polls closed on June 7, the vote count declared Lyon the winner of the nomination with 12,271 votes. Nordstrom received 12,261 votes.

Three days following the election, Nordstrom filed an application with the Law Division for a recount pursuant to *N.J.S.A.* 19:28–1. On June 13, the court granted the application, ordering that the "Morris County Board of Elections recount all Mail–In Ballots in the June 7, 2011 Republican Primary Election ... within four business days in order to quickly resolve which candidate will be placed on the General Election ballot."

The recount revealed that Lyon's margin of victory was narrower than ten votes. The election result then stood at 12,270 votes for Lyon and 12,264 votes for Nordstrom, a difference of six votes between the prevailing and defeated candidates.

On June 22, Nordstrom filed a verified petition in the Law Division challenging the results of the election. In her pleading, Nordstrom asserted that under *N.J.S.A.* 19:29–1(e) "a sufficient number of voters were disenfranchised ..., combined with a number of voters whose votes were improperly counted[,] as to change the result" so that Nordstrom should be declared the victor by "6 (six) votes or more."

On July 29, Nordstrom filed an amended petition, alleging violations of *N.J.S.A.* 19:29–1(e) and (f), contending that a correct tally would tilt the election "in favor of ... Nordstrom by more than [forty-one] votes." Additionally, the amended petition asserted that Lyon committed violations of *N.J.S.A.* 19:29–1(h) and "the campaign finance law, *N.J.S.A.* 19:44A–21(c)." Specifically, Nordstrom urged that Lyon had (1) willingly exceeded the campaign contribution limits by accepting a $16,000 contribution from his father [1] and (2) failed "to disclose donations as required by the 48 hour rule." [2]

---

[1] *See N.J.S.A.* 19:44A–11.3(a) (limiting individuals (other than the candidate) in certain elections to an aggregate contribution limit of $2,600 per election).

[2] *See N.J.S.A.* 19:44A–16(i) (requiring certain contributions and expenditures received or incurred in the last thirteen days of an election campaign to be reported to the New Jersey Election Law Enforcement Commission within "48

On August 12, Lyon moved to dismiss Nordstrom's claims arising under the Reporting Act due to (1) a lack of subject matter jurisdiction and (2) the petition's failure to state a claim upon which relief can be granted. *See R.* 4:6–2(e). The trial court denied Lyon's motion on August 18, explaining in an eight-page written opinion its reasons for retaining jurisdiction over Nordstrom's "campaign finance related claims pursuant to *N.J.S.A.* 19:29–1(h), *N.J.S.A.* 19:3–7, *N.J.S.A.* 19:44A–11.3, and *N.J.S.A.* 19:44A–16."

C.

In retaining jurisdiction over Nordstrom's Reporting Act claims, the trial court relied upon our decision in *In re Contest of the Democratic Primary Election of June 3, 2003 for Office of Assembly of the Thirty–First Legislative District,* 367 *N.J.Super.* 261, 842 *A.*2d 820 (App.Div.2004) and analyzed its authority to retain the dispute under the four-factor test found in *Muise v. GPU, Inc.,* 332 *N.J.Super.* 140, 753 *A.*2d 116 (App.Div.2000). Concluding that at least three of the four factors skewed in favor of judicial, rather than administrative, oversight, and finding that "this matter clearly involves an issue of urgency which can be better addressed in this forum," the matter remained in the Law Division.

D.

Trial commenced on August 18. The court heard testimony and reviewed documentary evidence over a period of nine days. At the conclusion of this hearing, the court issued a comprehensive thirty-seven page written opinion to support its judgment (1) declaring that Lyon's "nomination as the Republican Party candidate for the office of Morris County Freeholder is hereby null and void, pursuant to *N.J.S.A.* 19:3–7" and (2) ordering non-party Morris County Republican Committee to "select the candidate to fill such vacancy within three (3) days hereof."

---

hours of the receipt of the contribution" or "48 hours of the making, incurring or authorization of the expenditure").

The next day, the trial court issued an amended judgment giving the Morris County Republican Committee until the "end of day September 19, 2011" to fill the vacancy. On September 16, Lyon filed a notice of appeal together with an emergent application to stay the trial court's judgment. The motion was denied, but an order to accelerate the appeal was entered on October 5. On September 23, we granted permission to the New Jersey Election Law Enforcement Commission (ELEC) to intervene in the appeal.

E.

Although not part of the trial record, we take judicial notice of the following undisputed facts. *See N.J.R.E.* 201(b)(2), (b)(3). In compliance with the trial court's mandate, the Morris County Republican Committee timely selected Nordstrom to fill the vacancy created by the nullification of the June 7 primary election. The committee's vote tally was 213 votes for Nordstrom and 208 votes for Lyon.[3] At the November 8 general election, Nordstrom defeated Democratic Party opponent, Truscha Quatrone, by receiving 45,376 votes against Quatrone's 26,982 votes and 614 write-in votes for undisclosed candidates.[4]

F.

In order to better understand the issues on appeal, we provide the following additional factual background, all of which was developed at trial. In November 2010, Lyon decided to run for freeholder in Morris County. He formally filed his candidacy declaration in April 2011, naming his father as the treasurer of the campaign, and himself as deputy treasurer. Lyon's plan was to self-fund his campaign. Initially, Lyon's father loaned the campaign $1000. In May 2011 Lyon's mother contributed $1000. In preparation to serve as both candidate and deputy treasurer, Lyon

---

[3] *See* http://www.nj.com/news/index.ssf/2011/09/margaret_nordstrom_wins_gop_no.html (last visited on February 2, 2012).

[4] *See* http://www.morriselectionresults.org/index.htm (last visited on February 2, 2012).

read the ELEC Compliance Manual for Candidates (ELEC Manual).[5]

After recently graduating from college, Lyon began working for one of the many Lyon family businesses. He claimed to be a member of M of Rockaway, LLC (the LLC), a status he obtained when, in November 2010, just days after deciding to run for freeholder, his father made a gift of ten percent of the LLC to Lyon. There was no written memorialization of the transfer at that time; instead, a written assignment was prepared in August 2011, three weeks before trial. Lyon's father testified that owning an interest in a tax-paying LLC would assist his son during the campaign so that if Lyon were asked if he understood what it meant to pay property taxes, he could respond affirmatively.

In the waning days of the campaign Lyon decided to mail information to voters and to place signs in the community touting his candidacy. To fund his message, he secured what he thought was a $16,000 loan from the LLC to his campaign. Although he had check signing authority as a putative member of the LLC, on May 31, he prepared a $16,000 check payable to "Lyon for Conservative Freeholder" on the account of the LLC and had his father sign the instrument. The check was deposited into the campaign's bank account on the same day.

Lyon spent $14,225 to mail campaign brochures to voters. One piece of campaign literature expressly discussed Nordstrom's supposed position on public funding for open space, but others did not mention Nordstrom at all.

On ELEC's "20-day postelection report" required by *N.J.A.C.* 19:25-8.2(b)(3), Lyon (as the candidate) and his father (as the treasurer) erroneously reported the $16,000 as both a loan and a contribution, and identified the contributor as Robert Lyon. Lyon testified that he listed the funds as coming from Robert Lyon because his father had signed the check, even though Lyon had

---

[5] *See* http://www.elec.state.nj.us/pdffiles/forms/compliance/man_cf.pdf (last visited on February 2, 2012).

check signing authority and notwithstanding his assertion that the contribution originated in his own funds. He stated that because he believed that members of a limited liability company could loan money to a campaign, and he considered himself a member of the LLC, the money was his to use without limitation on the campaign.

Lyon further testified that he was unaware that there was a 48–hour reporting requirement for donations greater than $1200 within the last thirteen days prior to an election. He thought that there was an exception to any 48–hour reporting requirement if the contribution came from his own funds. He also believed that the exception applied to expenditures. When pressed, Lyon admitted that he did not comply with the 48–hour reporting requirement.

Robert Lyon agreed to serve as treasurer of Lyon's campaign and personally knocked on 1000 doors for his son. Father and son discussed spending $20,000 from the LLC, which they thought was reasonable. Lyon's father knew he signed the $16,000 check, but he considered the $16,000 contribution as coming from Lyon alone. He contended that any reference to him on the 20–day postelection report as the contributor was an error.

G.

The Law Division also learned about Nordstrom's campaign efforts. Nordstrom testified that potential donors did not contribute money to her campaign because they thought Lyon was not a threat, and because his ELEC reporting forms indicated that he was not raising a lot of money. She said it is common practice for candidates to review other candidates' reporting forms. In total, Nordstrom spent approximately $28,000 for the primary election; Lyon reported spending $19,959.

Nordstrom further testified that she changed her campaign strategy—"we ramp[ed] things down a bit"—because she was not raising the amount of contributions she expected and because she thought Lyon was not going to spend a lot of money on the campaign. She testified that individuals said they would give her

money if she really needed it. She also noted that there were "backup plans" if circumstances changed.

According to Nordstrom, she "was pretty upset" when she reviewed Lyon's 20–day postelection report a month after the primary election. For the first time, she saw that Lyon had spent $14,225 on mailings and $2525 on signs. She believed that her campaign was adversely affected by Lyon's failure to file the proper 48–hour report. She testified that she became furious when she read Lyon's open space brochure a couple of days after the primary election because it gave the misimpression that "County Open space monies went to ... create [her] own personal Shangri–La out in Middle Valley."

H.

The trial also focused upon Nordstrom's claim that the election was tainted by voter misconduct. Largely because the pre-trial vote tally separated Lyon and Nordstrom by only six votes, several days were devoted to exploring the Vote by Mail ballots that emanated from a senior housing development in Parsippany.

Twelve voters—all who supposedly submitted mail-in ballots and who lived in the same apartment building in Parsippany—testified at trial. The undisputed evidence revealed that some of these voters denied receiving their mail-in ballots, some admitted that their signatures appeared on their Vote by Mail applications, and some denied that the signatures were theirs. Others indicated that although their signatures appeared genuine, other writings on the Vote by Mail applications were in someone else's handwriting. Some of the witnesses could not recall whether they were registered Republicans or Democrats. A number of these voters testified that they appeared at polling stations and were permitted to cast provisional ballots. Much of the testimony was confusing, self-contradictory, and difficult to follow.[6] None of the witnesses were asked to identify the person for whom they actually voted.

---

[6] Because many of the witnesses' dominant language was Gujarati, the court provided an interpreter to facilitate their testimony. This linguistic hurdle may have contributed to the confusion that permeated their testimony.

An additional witness, Jigar Shah, testified that he collected ballots for people in the community and transported them to the Morris County Board of Elections. He said that he did not witness anyone fill in a ballot or sign a Vote by Mail envelope. Although he did not know the exact number of ballots for which he was the bearer, he said it was possibly thirty-two.[7] He did not collect ballots directly from the voters.

Shah could not remember the names of those who actually handed him ballots. He also was unaware that he was required to sign the outer envelope in the voter's presence to ensure that the ballot was valid.

I.

After considering all of the evidence, the Law Division made extensive findings of fact and conclusions of law. It divided the issues into two main areas: (1) "Illegal Votes Received" and (2) "Campaign Act Violations." [8]

First, the court held that thirty-two mail-in ballots were illegally counted because they were "not brought to the Board [of Elections] by a bearer who took the ballot directly from the voters, thus breaking the 'chain of custody.'" The court further found

[t]his illegality is compounded by the testimony of the voters that (i) they never received a mail-in ballot, (ii) they resided in a senior citizens complex, (iii) three of these voters did not vote this year, (iv) one voter has never voted at all, and (vii)

---

[7] The trial court found "it is uncontroverted that Mr. Shah transported thirty-two (32) ballots" to the Morris County Board of Elections. Shah "never inspected the ballots and had no idea which candidates were selected by these voters. He admitted to completing the outside Vote by Mail envelope ... for each of these ... voters, but not in their presence as required by law."

[8] A third subsidiary issue addressed by the trial court involved Nordstrom's claim that several voters were disenfranchised. The Law Division rejected the claim of voter disenfranchisement regarding "the Villa Walsh and Boonton voters" but agreed that two other ballots cast for Nordstrom should have been credited to her. Accordingly, the court adjusted the vote tally to reflect a final difference between Lyon and Nordstrom of four votes: 12,270 votes in favor of Lyon; 12,266 votes in favor of Nordstrom.

that all but one voter (who cast a provisional ballot) needed the services of a Gujarati interpreter and/or translator.

Relying upon *In Re Application of Mallon*, 232 *N.J.Super.* 249, 556 *A.*2d 1271 (App.Div.), *certif. denied*, 117 *N.J.* 166, 564 *A.*2d 883 (1989), the court determined that Nordstrom had demonstrated it was impossible to establish for whom the illegal votes were cast because "[Nordstrom] has undertaken all reasonable efforts to determine for whom these votes were cast." The court further stated, "[b]ecause it is impossible to determine what, if any votes were cast for [Lyon], there is no basis to deduct votes from either candidate's tally."

Based upon this finding, the Law Division opined that it would, consistent with *In re 1984 Maple Shade General Election*, 203 *N.J.Super.* 563, 497 *A.*2d 577 (Law Div.1985), direct a new election limited to the voting district in Parsippany from where the illegal votes emanated and from any other voting district that the Board of Elections identified as the residence of "the other twenty (20) 'voters.' " However, because the court held that "this matter [is not] 'simply' about election irregularities," the special election remedy was unnecessary.

The trial court then analyzed what it called "Campaign Act Violations." It first incorporated by reference its August 2011 decision to retain jurisdiction over Nordstrom's Reporting Act claims and promised, pursuant to *In re Contest of the Democratic Primary Election of June 3, 2003, supra*, 367 *N.J.Super.* at 281, 842 *A.*2d 820, "[t]o the extent possible, . . . to 'apply the standards ELEC would apply if the case was before ELEC.' " Thereafter, the court divided the issues between the last-minute $16,000 contribution and the conceded failure to timely file a 48–hour report pursuant to *N.J.S.A.* 19:44A–16(i).

The court found that the evidence did not support a "legally cognizable conveyance or assignment of [Robert] Lyon's interest in the LLC prior to the litigation, and that, therefore, this contribution is attributable to [Robert] Lyon." Additionally, because the LLC's $16,000 check was signed by Robert Lyon, and

the ELEC Manual "is a concise and understandable document" that explained who is deemed responsible for contributions emanating from a limited liability company,[9] the court found that the $16,000 contribution was from Robert Lyon and violated not only the Reporting Act's contribution limit, but also *N.J.S.A.* 19:29-1(h).

As a remedy for this excess contribution violation, the trial court stated:

> [T]he Court is satisfied that ... setting aside the election would be appropriate under all these circumstances, were it not for the relief granted below. Moreover, while ELEC lacks the statutory authority to impose this remedy, the Court refers this matter to it to determine what, if any, regulatory action should be taken.

The court then turned its attention to Lyon's admitted failure to file the 48-hour report mandated by *N.J.S.A.* 19:44A-16(i), *N.J.A.C.* 19:25-8.6 (addressing contributions received immediately before an election), and -8.6A (addressing expenditures made immediately before an election). After canvassing the ELEC Manual, the court rejected the argument that Lyon was confused or merely made a mistake in not timely reporting the $16,000, even if he honestly believed that he did not have to report what he thought was his own contribution.

The court found the remedy for this violation of the Reporting Act in Title Nineteen: *N.J.S.A.* 19:3-7 (providing for an election to be null and void if a candidate fails to file "any statement or oath required by this Title"). The court considered the mitigating provisions of *N.J.S.A.* 19:3-9 (listing the circumstances under

---

[9] *See also N.J.A.C.* 19:25-11.10(c), which provides:

A limited liability company organized pursuant to *N.J.S.A.* 42:2B-1 et seq., shall not be permitted to make contributions as an entity. A contribution received by a campaign or organizational treasurer drawn upon a limited liability company account and made by means of a check or written instrument drawn on the account of a limited liability company shall be signed by a member or members and shall be deemed to be a contribution from the member or members who signed the check or written instrument by which the contribution was conveyed or, in the case of the contribution of currency, the member who has conveyed the currency.

which certain offenses do not render an election null and void) but found it was not prepared

> to condone the failure of a candidate to be familiar with the clear mandates of Election Laws and Regulations, even in the face of the ELEC Manual, which in a straight-forward manner sets forth a candidate's responsibilities to file such a Report.
>
> ....
>
> To ignore this omission would create an unjustifiable excuse from the statutes and regulations which require transparency in the reporting of campaign contributions. Ignorance of the law simply cannot excuse compliance with this clear statutory and regulatory scheme.

Although the court did not find that Lyon had acted "with fraudulent intent," it held "that his failure to file the 48–hour Report materially impacted [Nordstrom's] campaign strategy to her significant disadvantage." Consequently, it determined that "it [is] just under these circumstances to declare [Lyon's] nomination ... null and void." This appeal followed.

## II.

A.

We examine first the Law Division's legal conclusion that it had jurisdiction to consider Nordstrom's Reporting Act grievances. A trial court's determination of whether an agency has primary jurisdiction over a claim is not provided any deference on appeal. *See Smerling v. Harrah's Entm't, Inc.*, 389 *N.J.Super.* 181, 186, 912 *A.*2d 168 (App.Div.2006) (citing *Muise, supra,* 332 *N.J.Super.* at 157, 753 *A.*2d 116).

Intervenor ELEC argues that the Legislature, in enacting the Reporting Act, provided ELEC with exclusive, not merely primary, jurisdiction over allegations of Reporting Act reporting violations.[10] We held in *In re the Contest of the Democratic*

---

[10] If an agency's interpretation of regulations that fall within a legislative scheme the agency is charged with implementing and enforcing are reasonable, we are required to defer to such agency interpretations. *See In re Hearn,* 417 *N.J.Super.* 289, 298–99, 9 *A.*3d 1032 (App.Div.2010).

*Primary Election of June 3, 2003* that ELEC only had primary jurisdiction over Reporting Act excess contribution violations, and not exclusive jurisdiction, because the Legislature arguably provided the judiciary with jurisdiction through *N.J.S.A.* 19:29–1(h). *Id.* at 285, 842 *A.*2d 820 (noting that although *N.J.S.A.* 19:29–1(h), broadly interpreted, might support the maintenance of an election contest on the basis of a Reporting Act violation, the better policy is to adjudicate the violation through the procedures the Legislature has expressed in the Reporting Act).

■ We are persuaded that while ELEC has primary jurisdiction over excess contribution claims under the Reporting Act, it enjoys exclusive jurisdiction over alleged reporting violations, including Nordstrom's grievance pursuant to *N.J.S.A.* 19:44A–16(i) (the 48–hour reporting violation). This conclusion does not change our view that in dealing with an excess contribution claim, a trial court

should (a) deem a verified petition that contains alleged [Reporting Act] violations as if it were a complaint under *N.J.S.A.* 19:44A–22d; (b) transfer the case, or the relevant counts containing [Reporting Act] violations, to ELEC, to whom the Legislature in our view assigned primary jurisdiction, *see R.* 1:13–4, unless the judge determines to keep jurisdiction after an appropriate analysis; and (c) if the judge decides to retain jurisdiction under the aegis of *N.J.S.A.* 19:29–1h, apply the standards ELEC would apply if the case was before ELEC.

The judge should engage in a primary jurisdiction analysis before retaining the case.

[*In re the Contest of the Democratic Primary Election of June 3, 2003, supra,* 367 *N.J.Super.* at 285, 842 *A.*2d 820.]

■ We reach our conclusion that ELEC has exclusive jurisdiction regarding reporting violations because of the overarching legislative goals of (1) guaranteeing transparency of campaign contributions and expenditures, (2) ensuring that disclosures of the same be managed and controlled by a single agency, and (3) implementing remedies for violations of the Reporting Act through a uniform and predictable system of sanctions. *See In re Election Law Enforcement Comm'n Advisory Op. No. 01–2008,* 201 *N.J.* 254, 26, 989 *A.*2d 1254 (2010). " 'As a general rule, jurisdiction of an administrative agency may be said to be exclu-

sive when the remedy which the agency is empowered to grant is the only available remedy for the given situation.' " *Smerling, supra,* 389 *N.J.Super.* at 187, 912 *A.*2d 168 (quoting *In re Hoboken Teachers' Ass'n,* 147 *N.J.Super.* 240, 248, 371 *A.*2d 99 (App.Div. 1977)).

*N.J.S.A.* 19:44A-16 comprehensively details candidates' reporting obligations. Failure to comply with the statute and its implementing regulations, *see e.g., N.J.A.C.* 19:25-8.1 to -8.12, exposes applicable persons—including candidates—to an array of penalties, including potential criminal sanctions found in *N.J.S.A.* 19:44A-21(b), and civil remedies found in *N.J.S.A.* 19:44A-22(a)(1).[11] Except for criminal matters and summary actions under *N.J.S.A.* 19:44A-22.1, judicial involvement is extremely limited.

■ The Law Division's use of *N.J.S.A.* 19:3-7 in connection with the Reporting Act's reporting obligations was misplaced. The general, undefined reference in *N.J.S.A.* 19:3-7 to "statement[s] and oath[s]" and the potential nullification of a nomination for "fail[ure] to file any statement or oath required by this Title to be filed, at the time, place and in the manner required by this Title" is inapplicable to such reporting obligations imposed by the Reporting Act. *N.J.S.A.* 19:44A-21(c) and -22(f), which both provide for forfeiture sanctions, are the only vehicles for nullifying an election for Reporting Act reporting violations. The use of *N.J.S.A.* 19:3-7 to invalidate Lyon's nomination was an unwarranted judicial arrogation of ELEC's authority.

B.

■ The Law Division also determined that Lyon's father had made an excess campaign contribution that, in part, paid for campaign literature that disadvantaged Nordstrom.[12] Although it

---

[11] *See also N.J.A.C.* 19:25-17.3 to -17.3D.

[12] Because we hold that the Law Division should not have exercised jurisdiction under *Muise,* we need not decide Lyon's claim that as a matter of law, the

did not expressly go so far as to trigger *N.J.S.A.* 19:29–1(h), the court held that "setting aside the election would be appropriate under these circumstances were it not for [the court's nullification of the nomination under *N.J.S.A.* 19:3–7]." Because this remedy could not, as the court recognized, be imposed by ELEC, and was only a judicially-authorized remedy, we address whether it was truly available to the Law Division. This implicates the application of the *Muise* factors to ascertain whether ELEC or the court should first exercise jurisdiction over Nordstrom's excess contribution accusation.

The two main purposes of primary jurisdiction are to (1) "allow an agency to apply its expertise to questions which require interpretation of its regulations," *Muise, supra,* 332 *N.J.Super.* at 159, 753 *A.2d* 116, and (2) "preserve uniformity in the interpretation and application of an agency's regulations." *Id.* at 160, 753 *A.2d* 116. The following four factors must be weighed when determining the application of the primary jurisdiction doctrine:

"1) whether the matter at issue is within the conventional experience of judges; 2) whether the matter is peculiarly within the agency's discretion, or requires agency expertise; 3) whether inconsistent rulings might pose the danger of disrupting the statutory scheme; and 4) whether prior application has been made to the agency."

[*Muise, supra,* 332 *N.J.Super.* at 160, 753 *A.2d* 116 (quoting *Boldt v. Correspondence Mgmt., Inc.,* 320 *N.J.Super.* 74, 85, 726 *A.2d* 975 (App.Div.1999)).]

The decision to invoke the doctrine of primary jurisdiction rests within the sound discretion of the court. *Alliance for Disabled in Action, Inc. v. Cont'l Props.,* 371 *N.J.Super.* 398, 408, 853 *A.2d* 328 (App.Div.2004), *aff'd o.b.,* 185 *N.J.* 331, 885 *A.2d* 952 (2005). Applying these standards, we conclude that the trial court

---

$16,000—sourced from family members with whom he lived—was not violative of *N.J.S.A.* 19:44A–11.3(a) because it was authorized under *N.J.S.A.* 19:44A–16(d):

Nothing contained in this section shall be construed to impose any limitation on contributions by a candidate, or by a corporation, 100% of the stock in which is owned by a candidate or the candidate's spouse, child, parent or sibling residing in the same household, to that candidate's campaign.

did not properly exercise its discretion when it brought into play the doctrine of primary jurisdiction.

As to the first factor, whether the matter is within the conventional experience of judges, the trial court compared this case to *In re the Contest of the Democratic Primary Election. of June 3, 2003* to find that the court had jurisdiction. It not only viewed the issues as purely legal in nature, but it found that unlike *In re the Contest of the Democratic Primary Election of June 3, 2003*, this was not a post-election situation. That was incorrect. The chronology of *In re the Contest of the Democratic Primary Election of June 3, 2003* is quite comparable to the timeline here. In both instances the primary elections took place in June and there is little to distinguish the cases.

Most importantly, we do not share the Law Division's characterization that Title Nineteen issues, particularly Reporting Act-related issues, "are straightforward and do not require agency expertise." To the contrary, the arcane language and imprecise scope of the Reporting Act and its regulations fortify our view that they comprise an esoteric and complex regulatory framework that requires, among other things, the detailed ELEC Manual and an extensive internet website to assist the public in understanding the law's breadth.[13]

By referring to the myriad of resources necessary to parse the Reporting Act we by no means denigrate the Law Division's conclusion that it was competent to explicate the law. Rather, we simply observe that ELEC—author of the regulations and overseer of the Reporting Act on a daily basis—was in the best position to first weigh in on the excess contribution controversy.

The trial court also found the second factor did not weigh in favor of agency primacy. This factor relates to agency expertise, which does not necessarily depend upon the complexity of the case, but rather whether the Legislature determined that the

---

[13] *See* http://www.elec.state.nj.us/index.htm (last visited on February 2, 2012).

agency had expertise in this area. The Reporting Act is squarely within the expertise of ELEC as the commission was created specifically with the intention that it have the fulsome ability to interpret and apply the law. *N.J.S.A.* 19:44A–6.

The trial court next explored the third factor by looking to the case of *Richardson v. Standard Guaranty Insurance Company,* 371 *N.J.Super.* 449, 853 *A.*2d 955 (App.Div.2004). It found that there would be no danger of disrupting the statutory scheme, a determination with which we are not so sanguine. The court further found that there would be no harm because it would limit its analysis to the same standards used by ELEC. Even if that were arguably what the court did in terms of its legal analysis, it transgressed far beyond ELEC's authority when it fashioned a remedy beyond the scope of the Reporting Act.

A court may not invade an agency's orbit of influence under a promise that it will apply administrative principles and mirror the agency's enforcement capabilities, unless it is truly prepared to stay within those parameters. The Law Division's use of a nuclear option—nullification of Lyon's nomination—was disproportionate to the putative violation and absolutely beyond the range of ELEC's power, thereby creating the very real potential for disparate outcomes in the future, depending upon the forum of a complainant's grievance.

The trial court gave considerable weight to ELEC's inability to provide the precise remedy sought by Nordstrom. However, merely because the agency was unable to accede to the relief demanded by Nordstrom does not prevent a trial court from staying its hand to allow ELEC to determine whether an excess contribution violation has occurred, and then weigh in on an appropriate remedy. *See Boldt, supra,* 320 *N.J.Super.* at 89, 726 *A.*2d 975.

The final *Muise* factor asks whether a grievance had been lodged with ELEC before Nordstrom proceeded with her Reporting Act claims in court. The trial court recognized that this factor

weighed in favor of Lyon's assertion of agency primacy, but discounted its weight because ELEC had "no authority to grant the relief sought by [Nordstrom], i.e., to void [Lyon's] nomination." That, we observe, is the point. The management, control, and remediation of excess campaign contributions are best left with the agency most experienced and equipped by the Legislature to handle such matters: ELEC, not the judiciary, except for the limited circumstances under *N.J.S.A.* 19:44A–21(c) (voiding a nomination or office after a finding of guilt to certain election-related fourth-degree crimes) and –22.1 (permitting an aggrieved candidate to bring a summary action).

In short, the Law Division should have transferred Nordstrom's excess contribution claim to ELEC and then limited its inquiry in the election contest to alleged violations of *N.J.S.A.* 19:29–1(e).[14]

C.

 Next, we turn to the issue of voter misconduct. We part company with the Law Division on its legal conclusion that Nordstrom's evidence demonstrated an entitlement to relief under *N.J.S.A.* 19:29–1(e), which provides as follows:

> The nomination or election of any person to any public office or party position, or the approval or disapproval of any public proposition, may be contested by the voters of this State or of any of its political subdivisions affected thereby upon 1 or more of the following grounds:
>
> . . . .
>
> e. When illegal votes have been received, or legal votes rejected at the polls sufficient to change the result[.]

The trial court candidly observed that "[w]hile no effort was made to produce all thirty-two voters, the twelve voters produced all testified that they did not cast these ballots. [Nordstrom] thus claims she has satisfied the impossibility requirement. The Court

---

[14] Because the efficacy of a transfer in connection with the primary election contest has been obviated by the passage of time, we elect not to transfer Nordstrom's grievances to ELEC. However, Nordstrom is free to request that ELEC undertake an investigation pursuant to its procedures. *See, e.g., N.J.S.A.* 19:44A–22(b); http://www.elec.state.nj.us/legalresources/resourceinvest.htm (last visited on February 2, 2012).

agrees." The court continued, noting that "[b]ecause it is impossible to determine what, if any, votes were cast for [Lyon], there is no basis to deduct votes from either candidate's tally." Accordingly, the court was inclined to require a do-over in the affected election district in Parsippany (and elsewhere, if the Board of Elections could identify other affected election districts). We are satisfied that Nordstrom's evidence did not satisfy the so-called impossibility standard and therefore she failed to demonstrate that "illegal votes [were] received ... sufficient to change the result." *N.J.S.A.* 19:29–1(e).

We are guided by the following principles:

Free and fair elections are the foundation on which our democracy rests. The right to vote, and to have one's vote counted, is both cherished and fundamental to our way of life. We rely on our election laws and on the fair conduct of elections to ensure that the people may be heard through the ballot and that their will, as expressed through their votes, may be effectuated. At the same time, we can only be certain that the true will of the people has been expressed if we can be confident in the election process itself. The right of a defeated candidate to contest the outcome of an election, while carefully circumscribed, is an important means to ensure that the true will of the people is indeed heard through the ballot box. [*In re Contest of the November 8, 2005 General Election for Office of Mayor of Twp. of Parsippany–Troy Hills,* 192 *N.J.* 546, 549, 934 *A.*2d 607 (2007).]

The statutory framework governing election contests, *N.J.S.A.* 19:29–1 to –14, fully recognizes that "our state election laws are designed to deter fraud, safeguard the secrecy of the ballot, and prevent disenfranchisement of qualified voters." *In Re Gray–Sadler,* 164 *N.J.* 468, 474–75, 753 *A.*2d 1101 (2000). The fundamental purpose of an election contest is "to ascertain the true will of the electorate." *Kirk v. French,* 324 *N.J.Super.* 548, 552, 736 *A.*2d 546 (Law Div.1998) (*citing Wene v. Meyner,* 13 *N.J.* 185, 196, 98 *A.*2d 573 (1953)).

When Nordstrom contested the outcome of the June primary election based upon the alleged receipt of illegal votes under *N.J.S.A.* 19:29–1(e), she was required to shoulder the burden of proof as to two elements. *See Application of Mallon, supra,* 232 *N.J.Super.* at 268, 556 *A.*2d 1271 (citing *Application of Murphy,* 101 *N.J.Super.* 163, 167, 243 *A.*2d 832 (App.Div.), *certif. denied,* 52 *N.J.* 172, 244 *A.*2d 302 (1968)). First, Nordstrom had to prove

" 'that illegal votes were cast in number sufficient to change the result if they had in fact been cast for the contestee.' " *Ibid.* (quoting *Murphy, supra,* 101 *N.J.Super.* at 167, 243 *A.*2d 832). Second, she was obliged " 'to the extent possible under the circumstances, [to show] for whom the illegal votes were cast.' " *Ibid.* (quoting *Murphy, supra,* 101 *N.J.Super.* at 167, 243 *A.*2d 832).

 Although the general rule requires proof for whom the illegal votes were cast, our law, however, provides an exception applicable where "the challenger cannot establish to the extent possible under the circumstances for whom the illegal vote was cast." *Id.* at 269, 556 *A.*2d 1271. To take advantage of this exception, the challenger must show "that it is not possible to locate the person who casts the illegal vote or, if located, to compel the voter under [*N.J.R.E.* 513] to disclose how he or she cast the illegal vote." *Ibid.* Accordingly, Nordstrom "must show the exercise of reasonable diligence in attempting to find the challenged voter and that, despite such diligence, he or she could not be found." *Ibid.* The challenger must bear the burden established through both prongs, "and, in addition, prove that despite diligent effort the illegal voter could not be found or refused to disclose his vote." *Ibid.*

This matter never presented a situation in which witnesses could not be found. Nordstrom produced twelve persons whose mail-in ballots were questionably cast. This number would be arithmetically sufficient to upset the election because of the final, judicially-determined, four-vote difference that separated Lyon from Nordstrom. However, although these witnesses were present in court and subject to Nordstrom's direct examination, none were asked for whom they cast their ballots. We do not view such questioning as futile given the disparate, contradictory, and confusing answers many of the witnesses gave when asked about their conduct prior to, and on, primary election day. The record reveals a careful avoidance—by both sides, to be sure—of such questioning.

This vacuum, however, is the crux of the problem. By not making the inquiry, impossibility was not demonstrated. We will

not assume that if asked, these voters would have maintained the view that they did not, in fact, cast Vote by Mail ballots or even that they would have exercised their privilege pursuant to *N.J.R.E.* 513. Simply, we do not know because no one—particularly Nordstrom—asked. Given the range of their testimony, had a sufficient number of the witnesses been pressed on direct examination, some might not only have recalled voting but then volunteered the name of the candidate for whom they voted.

Our canvass of the record leaves us with the unavoidable legal conclusion that although illegal votes may indeed have been cast in the June primary election by a small number of Parsippany residents, they were not sufficient to change the result. Accordingly, the Law Division's conclusion to strip Lyon of the nomination was incorrect and legally unsustainable.

### III.

Courts do not have a roving commission to investigate, root out, and then remediate all election irregularities. Our role is to proceed vigilantly under the legislative mandate of Title Nineteen, no more and no less. If we perform that task, the public interest will be favored. Election laws "should not be construed so as to deprive voters of their franchise or so as to render an election void for technical reasons." *Kilmurray v. Gilfert,* 10 *N.J.* 435, 440, 91 *A.*2d 865 (1952).

We do not lightly determine that the Law Division erred and that Lyon should have been the Republican nominee to run in the November 2011 general election. Said another way, Nordstrom should not have been the Republican nominee to run in said general election. Because the passage of time has made it impossible for Lyon to run against the nominee of the Democratic Party, and Nordstrom has been a de facto freeholder since being sworn in,[15] it is necessary to remove Nordstrom as a member of

---

[15] *See* http://morriscountypr.blogspot.com/2012/01/chegwidden-cabana-leadfreeholder-board.html (last visited on February 2, 2012).

the board of freeholders and declare a vacancy in said office pursuant to *N.J.S.A.* 40:20–35.11a(a), effective immediately.

We are unaware of any authority that would, as Lyon argues, result in Lyon being mandatorily "instated as the Morris County Freeholder," [16] either for the balance of the term or on an interim basis. *Cf. N.J.S.A.* 40:20–35.11b.

The judgment of the Law Division is reversed.

---

[16] Even if—as the trial court hinted—victory in the Republican primary is tantamount to victory in the general election, we cannot know how Lyon would have fared against the Democratic nominee if pitted against one another.

