**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4903-18T3

JD JAMES CONSTRUCTION,
LLC,

     Plaintiff-Respondent,

v.

PDP LANDSCAPING, LLC,

     Defendant,

and

BDP EXCAVATING, INC.,
PHILIP CALABRESE, JR.,
PHILIP CALABRESE, III, and
PERRY DORTONE,

     Defendants-Appellants.

_____

        Submitted August 25, 2020 – Decided September 18, 2020

        Before Judges Alvarez and Gooden Brown.

        On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-2404-16.

Steven A. Berkowitz & Associates, PC, attorneys for appellants (Steven A. Berkowitz, on the briefs).

Hyland, Levin, Shapiro, LLP, attorneys for respondent (Daniella Gordon, on the brief).

PER CURIAM

Defendants BDP Excavating, Inc. (BDP), Philip Calabrese, Jr., Philip Calabrese, III, and Perry Dortone appeal from the June 27, 2019 judgment entered in favor of plaintiff JD James Construction, LLC, following a bench trial. Pursuant to the judgment, defendants were held jointly and severally liable for $94,848.78, and assessed $10,000 in attorney's fees against BDP only. We affirm.

We derive the following facts from the trial record, adopting by reference the "factual conclusions reached by the trial court because we are mindful of, and readily observe, the principle that our scope of review of a judgment in a non-jury case is extremely limited." Nordstrom v. Lyon, 424 N.J. Super. 80, 86 (App. Div. 2012) (citing Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)).

On November 18, 2015, PDP Landscaping, LLC (PDP) entered into a written agreement with Warfel Construction Company (the Warfel contract) for PDP to perform work as a subcontractor for a commercial construction project

in Maple Shade for which Warfel had been hired as the general contractor (the project). Signatories on behalf of PDP for the Warfel contract included Calabrese, III, as PDP's "Executive," his father, Calabrese, Jr., as the "Subcontractor Safety Director," and Dortone, as the "Project Manager."

Thereafter PDP's principals, acting under the entity names of BDP and "PDP Enterprises,"[1] hired plaintiff to perform concrete construction work for the project, by virtue of which the entities executed a written agreement dated February 29, 2016 (the subcontract). The subcontract provided that plaintiff was to install "[c]oncrete curbing[,] . . . concrete sidewalks[,] and associated concrete flat work" with payment due to plaintiff "within [thirty] days of completion" of the agreed upon work. Calabrese, Jr. and Dortone signed the subcontract on behalf of defendants under the titles "President PDP" and "Vice [P]resident of sales/project manager," respectively, and David Peluse signed on behalf of plaintiff as its "President" and sole principal.

Throughout 2016, after completing work on the project as required under the subcontract, plaintiff submitted three invoices to Dortone for payment as

---

[1] Calabrese, Jr. testified that BDP, which had not done business since 2005, and PDP both operated out of his house, shared the same phone number, and shared the same e-mail address. He also acknowledged that BDP's Facebook page posted pictures of PDP's jobs, including pictures of the project.

A-4903-18T3

follows: (1) June 10, 2016 for $55,568; (2) July 16, 2016 for $30,268; and (3) August 17, 2016 for $49,588. The August 17 invoice, which was the final invoice submitted upon completion of the work in full, indicated the total amount of $135,424 was "past due." Peluse testified that none of the "invoices [were] ever rejected" by defendants either orally or in writing, and no deficiency in the performance of the work was ever reported. Nonetheless, Peluse never received payment for any of the work performed. According to Peluse, when the invoices were not timely paid, he "sent . . . emails to . . . Dortone" and "called . . . Dortone with no results." He also "went to the site to personally talk to [Calabrese, Jr.]" about the unpaid invoices. However, Calabrese, Jr. denied having any conversations with Peluse regarding non-payment.

Under the Warfel contract, Warfel required PDP to "insure that all sub-subcontractors . . . [were] paid all amounts due in connection with the performance of th[e] subcontract." PDP also agreed to submit to Warfel with their payment applications, claim releases and lien waivers certifying "that all amounts owed in connection with performance of th[e] subcontract [were] paid." Following receipt of plaintiff's first two invoices, PDP submitted corresponding payment applications and accompanying lien waivers to Warfel on June 21 and July 22, 2016. In those payment applications, in addition to listing various other

A-4903-18T3

incurred expenses, Dortone "certif[ied]" that the "[c]urb" work had been performed.

Although PDP was paid over half a million dollars by Warfel over the course of the project,[2] including funds received in direct response to the payment applications certifying that the curb work had been performed, it was undisputed that PDP failed to make any payments to plaintiff and instead used the funds for other business purposes. Peluse testified that when he told Calabrese, Jr. he had "done everything . . . asked of [him] and . . . [had not] received a penny[,]" Calabrese, Jr. responded that defendants "ha[d not] received any money" from Warfel. Prior to this conversation, however, Peluse had spoken "to representatives through Warfel" who confirmed "through scheduled documentation" that PDP had "already billed for [plaintiff's] services."[3] According to Calabrese, Jr., PDP was not paid a balance of over $268,000 remaining on the Warfel contract, inferring that plaintiff's funds were included in the unpaid balance.

---

[2] The July 22, 2016 lien waiver specified that PDP had "been paid $568,986.89" by Warfel for all work performed through June 1, 2016.

[3] We note that the judge "indicate[d] for the record that [he] underst[oo]d the hearsay aspect of [Peluse's testimony]" and remarked that these statements were "just being offered as an explanation."

A-4903-18T3

On July 5, 2018, plaintiff filed an amended complaint against PDP and BDP alleging breach of contract, unjust enrichment, and violation of the New Jersey Prompt Payment Act, N.J.S.A. 2A:30A-1 to -2 (NJPPA). By seeking to pierce each entity's corporate veil, the complaint also alleged fraud against Calabrese, Jr., Calabrese, III, and Dortone, in their individual capacities as well as against each entity. PDP filed for bankruptcy on August 31, 2018, in the United States Bankruptcy Court for the Eastern District of Pennsylvania (bankruptcy court), and plaintiff was listed among the creditors in PDP's bankruptcy filing. Pursuant to the automatic stay instituted by the bankruptcy court, plaintiff's breach of contract, unjust enrichment, and NJPPA claims against defendants were no longer viable, leaving only the veil-piercing and fraud claims.

Prior to trial, defendants moved to dismiss plaintiff's complaint on the basis that PDP was an indispensable party for plaintiff to recover on the fraud claim. Defendants averred that because plaintiff could no longer proceed against PDP as a result of the bankruptcy proceedings, the remaining allegations against its alter ego, BDP, and PDP's principals, who were officers common to both entities, had to be dismissed. On April 30, 2019, the trial court denied defendants' motion on the ground that PDP was "not an indispensable party to

the litigation." The court determined plaintiff had sufficiently alleged that "the principals of the business committed the tortious acts, and therefore the [fraud and veil-piercing] claims [were] sustainable even without PDP."[4]

At the conclusion of the two-day bench trial, the judge found in favor of plaintiff on the fraud count against BDP and against Calabrese, Jr., Calabrese, III, and Dortone, individually. In a June 6, 2019 oral decision, the judge determined the evidence presented justified piercing the corporate veil of BDP to the extent that it was liable for PDP's fraud as an alter-ego entity. See Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 215 F. Supp. 2d 482, 497 (D.N.J. 2002) ("veil-piercing is proper when a subsidiary is an alter ego or instrumentality of the parent corporation."). Specifically, the judge found that "whatever judgment is entitled to be rendered against . . . [PDP] would be entitled to be entered against [BDP]" because there was "no effort to distinguish between the two corporations."

Further, the judge concluded that under the participation theory, "a director or officer of a corporation is individually liable for his or her own tortious acts even when those acts are committed in connection with or in

_____

[4] Following the entry of the June 27, 2019 judgment, PDP was dismissed from the case without prejudice by consent order dated August 6, 2019.

furtherance of the corporate business." See Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 303-04 (2002) ("[T]he essence of the participation theory is that a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort."). See also State, Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983) (finding that veil piercing is appropriate where an individual uses a corporation as his or her alter ego and abuses the corporate form to defeat the ends of justice, perpetuate a fraud, accomplish a crime, or otherwise evade the law).

Next, the judge defined common law fraud

> as an intentional misrepresentation of material existing fact made by one person to another with knowledge of its falsity and for the purpose of inducing the other person to act and upon which the other person relies with resulting injury or damage.
>
> Fraud is also the intentional use of deceit, a trick or some dishonest means to deprive another of his or her money or property or legal right . . . . Also fraud is the intentional deception to secure unfair or unlawful gain.

In making fact-findings, the judge stated there was "an agreement between Warfel and the defendant corporation," which imposed "obligations" on defendants to "not . . . put anybody else's rights in jeopardy." Crediting Peluse's

8

testimony over that of the defense witnesses,[5] the judge explained that "[t]here was ongoing communication[]" by Peluse, who, "at all times [kept] . . . defendants fully aware" of his performance under the terms of the sub-contract, by virtue of which Calabrese, Jr., Calabrese, III, and Dortone "were fully aware of [plaintiff's] progress and . . . what [work] was completed." As a result, the judge determined that plaintiff's services under the sub-subcontract "were, in fact, undertaken and . . . were, in fact, performed."

The judge further found that over the course of the subcontract, Warfel paid PDP "about $560,000" and PDP "took the money, . . . used [it] for whatever other business purposes they thought [were] appropriate, and . . . defrauded . . . plaintiff." The judge expressly rejected defendants' claim that they intended to pay plaintiff "when [they got] the other 200 plus thousand" from Warfel. The judge determined that "[t]here [could] be no other conclusion" but that "[e]verything that was done here was done with an effort to deny [plaintiff] fair compensation."

In finding defendants liable for fraud, the judge reasoned that

> [b]ased on accepted definitions of fraud, it . . . would
> be just beyond the pale of any fair sense of
> consideration that if I do things and I induce you either

---

[5] In addition to Peluse, Calabrese Jr., Calabrese, III, and Dortone testified at the trial.

as inferentially as an inferred party or as a third party beneficiary to do that which you would not have done or I collect sums allegedly on your behalf and I deny you use of them, it's more than a breach of con[tra]ct. It is a breach of your fiduciary obligation. It is fraud. It is the doing or not doing of an act which you shouldn't or should have done. That's the bottom line here.

. . . .

It would just stretch beyond all credibility a view that . . . inferentially . . . plaintiff would have to wait for the unpaid balance from Warfel to [PDP] in order to qualify for payment when the individuals in this corporation certainly knew on behalf of the corporation as well as individually that . . . plaintiff was continuing to perform work based on the inferred promise that they would be paid. When money was received, they would get it. That's the chain of supply here. Warfel . . . to the defense corporation, then to plaintiff . . . , but that's the acknowledged sense of what was going on.

And, clearly, giving Warfel releases of liens of which at least $85,000 is represented by work done at that juncture, acknowledged work done by . . . plaintiff is just unconscionable. It's unconscionable as a matter of equity, it's unconscionable as a matter of law. It certainly creates an imbalance, an injustice, a degree of fair play which this court or any court in this state should not countenance. It is wrong.

In rejecting defendant's contention that any recovery by plaintiff was restricted to "a breach of contract [claim,]" and that "the economic loss doctrine" prevented plaintiff from "convert[ing] a breach of contract claim into a tort" in

the absence of any "indication of fraud extrinsic to the performance of the contract," the judge explained:

> So I do find that all of these gentlemen represented themselves to be officials of the corporation and that was understood that they held themselves out as being part and parcel of what was going on here, and to come before the [c]ourt and say, . . . there was a contract, it's just a plain old breach of contract, I have to say to you . . . that's pure nonsense. This was more than all of that.
>
> And, therefore, I'm entering judgment for the reasons that I've indicated because under just pure fraud, ongoing fraud, fraud in the inducement, . . . fraud in the receipt of payment, fraud in the ability not to pay, misuse of the money that [defendants] inferred they would [pay to plaintiff], at least it would fit the definition in my view . . . that at the very least, . . . plaintiff is also a third party beneficiary of [PDP's] contract [with Warfel].[6]
>
>          . . . .

---

[6] See N.J.S.A. 2A:15-2 ("A person for whose benefit a contract is made, either simple or sealed, may sue thereon in any court . . . although the consideration of the contract did not move from him."); Broadway Maint. Corp. v. Rutgers, State Univ., 90 N.J. 253, 259-60 (1982) ("The principle that determines the existence of a third party beneficiary status focuses on whether the parties to the contract intended others to benefit from the existence of the contract, or whether the benefit so derived arises merely as an unintended incident of the agreement[,]" and, depending on the facts, "construction contracts [may] afford a third party a right to sue.").

> [P]laintiff is more than an incidental beneficiary. He is the person for whom these releases and this money is received in part as well as others.

Relying on the June 21 and July 22, 2016 payment applications that PDP submitted to Warfel certifying that curb work had been performed, as well as plaintiff's June 10 and July 16, 2016 invoices, the judge determined that plaintiff sustained its burden of proof to find defendants jointly and severally liable in the amount of $85,836—the amount owed to plaintiff after its second invoice[7]—plus interest later calculated at $9012.78, as well as $10,000 in attorney's fees assessed against BDP only. On June 27, 2019, the judge entered a memorializing order of judgment, and this appeal followed.

On appeal, defendants argue that the judge erred in entering judgment against defendants on the fraud claim because plaintiff "failed to prove at least two of the five necessary elements of that tort[,]" and, "[e]qually important," the "economic loss doctrine precludes [plaintiff's] fraud claim."

We review defendants' arguments applying a limited standard of review:

> Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: "we do not disturb the factual findings and legal conclusions of the trial judge

---

[7] The judge determined that plaintiff's final August 17, 2016 invoice "[was] far beyond the date" of defendants' "certifications . . . to Warfel" and was therefore not recoverable.

A-4903-18T3

unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."

[Seidman, 205 N.J. at 169 (quoting In re Tr. Created By Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008)).]

"Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility."  Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)); see also N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 453 N.J. Super. 272, 306 (App. Div. 2018) (observing that a judge in a non-jury trial has the best "opportunity to hear and see the witnesses and to get a 'feel' for the case that the reviewing court [cannot] enjoy" (alteration in original) (quoting Twp. of W. Windsor v. Nierenberg, 150 N.J. 111, 132 (1997))).  Informed by this deferential standard of review, we turn to the substantive principles governing this appeal.

In order to establish the tort of fraudulent inducement, a plaintiff must prove a misrepresentation of material fact, knowledge or belief by the defendant of its falsity, intent that the other party rely on it, and detrimental reliance thereon by the other party.  Nolan v. Lee Ho, 120 N.J. 465, 472 (1990) (citing Jewish Center of Sussex County v. Whale, 86 N.J. 619, 625 (1981)).  "The representation may consist of a present intention to act or not act in the future."

13

Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 395-96 (App. Div. 1989). See Van Dam Egg Co. v. Allendale Farms, Inc., 199 N.J. Super. 452, 457 (App. Div. 1985) ("A promise to pay in the future is fraudulent if there is no present intent ever to do so.").

> This intention may be derived from circumstantial evidence such as: the recklessness or implausibility of the statement in light of later events; showing that the promisor's intentions were dependent upon contingencies known only to the promisor; or simply from evidence indicating that the promisor would not or could not fulfill the promise.
>
> [DiDomenico, 236 N.J. Super. at 396 (citing Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 381 (App. Div. 1960)).]

Fraud in the inducement does not differ materially from common law fraud, as it provides a cognizable basis for equitable relief in the event a false promise induced reliance. See Lipsit v. Leonard, 64 N.J. 276, 283-84 (1974). However, "fraud is never presumed, but must be established by clear and convincing evidence." Weil v. Express Container Corp., 360 N.J. Super. 599, 613 (App. Div. 2003) (citing Albright v. Burns, 206 N.J. Super. 625, 636 (App. Div. 1986)).

Under the economic loss doctrine, a plaintiff is prohibited "from recovering in tort economic losses to which their entitlement only flows from

14

contract." Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F. Supp. 2d 557, 562 (D.N.J. 2002) (quoting Duquesne Light Co. v. Westinghouse Elec. Co., 6 F.3d 604, 618 (3d Cir. 1995)). The doctrine precludes a tort remedy in "a contractual relationship unless the breaching party owes an independent duty imposed by law." Saltiel, 170 N.J. at 316-17 (holding that "the existence of duties that are specifically imposed by law in New Jersey . . . can be enforced separately and apart from contractual obligations."). In essence, the doctrine "functions to eliminate recovery on 'a contract claim in tort clothing.'" G&F Graphic Servs. v. Graphic Innovators, Inc., 18 F. Supp. 3d 583, 588-89 (D.N.J. 2014) (quoting SRC Constr. Corp. v. Atl. City Hous. Auth., 935 F. Supp. 2d 796, 801 (D.N.J. 2013)); see also New Mea Constr. Corp. v. Harper, 203 N.J. Super. 486, 494 (App. Div. 1985) (finding that defendant's failure to use construction material specified in the parties' contract was a type of conduct "not ordinarily alleged in a tort case," and could not give rise to a separate claim by "[m]erely nominally casting [the] cause of action" as a tort claim).

While New Jersey courts have applied the economic loss doctrine in the strict liability and negligence contexts, see, e.g., Alloway v. Gen. Marine Indus., L.P., 149 N.J. 620 (1997), Spring Motors Distribs., Inc. v. Ford Motor Co., 98 N.J. 555 (1985), "[n]o New Jersey Supreme Court case [has held] that a fraud

15

claim cannot be maintained if based on the same underlying facts as a contract claim." Gleason v. Norwest Mortg., Inc., 243 F. 3d 130, 144 (3d Cir. 2001). In fact, the law on whether a plaintiff may recover for purely economic loss on concurrent fraud and contract claims has arisen predominantly out of the New Jersey federal courts and other jurisdictions, not our state courts. See Florian Greenhouse v. Cardinal IG Corp., 11 F. Supp. 2d 521, 528 (D.N.J. 1998) ("Confronted with the 'morass' of case law in this area, the Third Circuit commented that 'the continuing validity of fraud claims in cases involving frustrated economic expectations under New Jersey law is very complex and troublesome.'" (quoting Vanguard Telecomms., Inc. v. S. New England Tel. Co., 900 F.2d 645, 653 (3d Cir. 1990))).

When New Jersey federal courts "have permitted a fraud claim to proceed with a breach of contract claim" as an exception to the economic loss doctrine, such cases "generally appear to have involved a fraud in the inducement of a contract" as opposed to "fraud in the performance of a contract . . . ." G&F Graphic Servs., 18 F. Supp. 3d at 593 (quoting Bracco Diagnostics, Inc., 226 F. Supp. 2d at 563). As a result, "the fraud in the inducement exception to the economic loss doctrine" has emerged and has been consistently applied by New Jersey federal courts to sustain fraud claims in breach of contract cases. Ibid.

A-4903-18T3

See Florian, 11 F. Supp. 2d at 527 (citing multiple "New Jersey federal . . . cases [that] have permitted fraud claims to stand in breach of contract cases.").

"The distinction between fraud in the inducement and fraud in the performance of a contract" is "the conceptual distinction between a misrepresentation of a statement of intent at the time of contracting, which then induces detrimental reliance on the part of the promisee, and the subsequent failure of the promisor to do what he has promised." Bracco Diagnostics, Inc., 226 F. Supp. 2d at 563 (quoting LoBosco v. Kure Enq'q Ltd., 891 F. Supp. 1020, 1032 (D.N.J. 1995)). In "recognizing the . . . distinction," the "'critical issue' with regard to economic loss 'is whether the allegedly tortious conduct is extraneous to the contract.'" Id. at 564 (internal citations omitted). See also Spring Motors, 98 N.J. at 578-79 (dismissing tort-based claims because the plaintiff merely alleged that the defendant did not fulfill its contractual obligations).

Here, the judge determined that defendants' unlawful conduct extended far beyond mere failure to perform under the sub-contract. The judge specifically found defendants liable for "fraud in the receipt of payment, fraud in the ability not to pay, [and] misuse of the money" Warfel paid to PDP that should have flowed in part to plaintiff. The judge also explicitly found

17

defendants liable for "fraud in the inducement" in the formation of the sub-subcontract with plaintiff, thereby rendering the economic loss doctrine inapplicable to bar plaintiff's fraud claim even under federal standards.

Contrary to defendants' contention, among the various fraud theories relied upon by the judge, the judge specifically found fraud in the inducement based on defendants contracting with plaintiff to perform work for which there was no intention to pay. The judge's decision in this regard was undoubtedly informed by the fact that Calabrese, Jr. admitted that neither PDP Enterprises nor BDP, the contracting entities under the sub-contract with plaintiff, were actively operating in 2016 or had any involvement with the Warfel project. Further, as the judge noted, both Calabrese, Jr. and Calabrese, III admitted "jump[ing] from corporation to corporation" under arguably suspicious circumstances when they contracted with plaintiff.

While "[a] promise to pay in the future is fraudulent if there is no present intent ever to do so[,]" whether the promisee did rely and, if so, whether the reliance was justifiable "is a fact question, in every case in which it is disputed[.]" Van Dam Egg Co., 199 N.J. Super. at 457-58. In reviewing the judge's fact findings, "[w]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, LLC v.

Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (alteration in original) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). While "our review of the sufficiency of the facts to satisfy an applicable legal standard is a question of law" that is subject to "plenary" review, id. at 498-99, "[r]eversal is reserved only for those circumstances when we determine the factual findings and legal conclusions of the trial judge went 'so wide of the mark that a mistake must have been made.'" Llewelyn v. Shewchuk, 440 N.J. Super. 207, 214 (App. Div. 2015) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).

Here, defendants have demonstrated neither manifest error nor mistake. The judge rendered a comprehensive and considered opinion, and, given defendants' conduct, a finding of fraud in the inducement was certainly permissible and supported by the credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19